GIBSON, ET AL. *v.* TALBOT COUNTY BOARD
OF ZONING APPEALS, ET AL.

[No. 264, September Term, 1967.]

*Decided per curiam on April 3, 1968.*

*Opinion filed June 4, 1968.*

The cause was argued before HAMMOND, C. J., and HOR-█* MARBURY, BARNES, McWILLIAMS and SINGLEY, JJ.

*T. Hughlett Henry, Jr.* and *William H. Adkins, Jr.,* with whom were *Henry, Henry & Adkins,* on the brief, for appellants.

*L. Clark Ewing* for appellees *Charles F. Willis, Jr.* and *J. Donald Griffin, Jr.*

No brief filed for appellee Talbot County Board of Zoning Appeals.

BARNES, J., delivered the opinion of the Court.

This appeal is from an order of the Circuit Court for Talbot County (Carter, C. J.), dated July 27, 1967, affirming a decision of the Talbot County Board of Zoning Appeals (Board). The Board granted the appellees, Charles F. Willis, Jr. and J. Donald Griffin, Jr., a special exception under the Talbot County Zoning Ordinance to permit the operation of a private junior college on certain land in Talbot County, known as "Kirkland Hall Farm," subject to ten restrictions or limitations. The appellants are the owners and occupants of property adjoining Kirkland Hall. There is no challenge of their right to appeal either to the circuit court or to this Court.

The application for the special exception was filed with the Board on January 19, 1967, in accordance with Section IV of the Zoning Ordinance which permits a private school as a special exception in any zone following a public hearing by the Board. The Board may grant a special exception upon its finding that:

"(a) The proposed use does not affect adversely the General Plan for the physical development of the County.

"(b) The proposed use will not affect adversely the health and safety of residents or workers in the area and will not be detrimental to the use or development of adjacent properties or the general neighborhood.

"(c) The standards set forth in each particular use for which a special exception may be granted have been met. Where no standards have been established in the Ordinance, or where the Board of Appeals deems it is in the public interest, standards or regulations

may be established in each case by the Board of Appeals in addition to those in the Ordinance."

The Board must also find that "such use will not constitute a nuisance because of noise, sanitary conditions, or traffic, and will not affect adversely the present character or future development of the surrounding community and that such use of land will conform to the stated minimum requirements, * * *."

The Zoning Ordinance divides Talbot County (except for certain incorporated towns and the one mile around them) into five zones: Zone A, farming-residential; Zone B, waterfront-residential (including waterfront petition); Zone C, suburban-residential; Zone D, commercial; and, Zone E, industrial. Most of Kirkland Hall is located in Zone B, waterfront-residential, which has a requirement of a two-acre minimum lot size. There is, however, a narrow strip on each side of Maryland Route 33, which runs through the property, in Zone C, suburban-residential, in which there is a 15,000 square foot minimum for each lot.

Kirkland Hall contains approximately 357 acres, on both sides of Route 33, a two-lane hard-surfaced highway which runs between Easton and St. Michaels and then on to Claiborne. It is located approximately four miles from Easton and is bounded on the south by Moreland Creek as well as by the Wilson and "Perry Hall" properties (also owned by Willis and Griffin) and on the north by land owned by the Aveley Corporation, one of the appellants, and occupied by Gibson, also one of the appellants. Approximately 192 acres of Kirkland Hall are wooded and this wooded area lies to the southeast of Route 33. The remaining 165 acres are located northwest of Route 33 and extend from the highway to the Miles River. Kirkland Hall has some 1.7 miles of frontage on Route 33 and has water frontage of 6,000 feet. Perry Hall, adjoining Kirkland Hall on the south, contains approximately 312 acres. The general area surrounding Kirkland Hall is sparsely-settled, has no subdivisions, is used generally for large estates and is attractive and peaceful.

The appellants have raised and argued three questions before us on this appeal:

1. Did the Board deny the appellants due process of law in re-

fusing to permit unlimited cross-examination to persons at the zoning hearings not represented by counsel?

2. Did the Board deny the appellants due process of law by not providing a hearing area at the first zoning hearing sufficiently large to accommodate all persons who wished to attend?

3. Did the Board err in granting the special exception because there were insufficient facts to justify the Board's action?

After argument this Court concluded that all of these questions should be answered in the negative and issued a *per curiam* order that the trial court's order affirming the Board would be affirmed. This was done so that the appellees could proceed in a timely fashion to publish and distribute their catalogue for the school year beginning in September, 1968. We will discuss additional facts when we consider the three questions in the order indicated.

1.

In the case before the Board the chairman at the opening of the hearing on February 6, 1967, announced that the applicants by their attorney would present their case following which those who "oppose the granting of the application who are represented by counsel, counsel will be given an opportunity to cross-examine." The chairman then announced that counsel for the opponents would then put on their case and the applicant's counsel would be permitted to cross-examine. Thereafter, he stated that at the conclusion of the cases of people who are represented by counsel, "all those people who are either in favor or opposed who have any additional testimony, in facts, to give the Board will be given an opportunity to do so." He then announced that the hearing would adjourn at 10:30 p.m. approximately 2½ hours later and, if necessary, would be resumed at 8 o'clock p.m. one week later. Near the end of the first night's hearing the chairman announced that cross-examination would be permitted only by counsel. John S. L. Yost, the person requesting the right of cross-examination, was, in fact, a member of the Bar and he was permitted to cross-examine. At no other time was there any statement made by the chairman or other members of the Board in regard to cross-examination, nor did any one other than Mr. Yost ask permission to cross-examine.

The record of testimony taken before the Board at the first night's hearing indicates that cross-examination by counsel of the witnesses of the applicants was searching and extensive. It appears that there was no necessity for further cross-examination and possibly for this reason no persons present requested the right to cross-examine.

At the beginning of the second night's hearing on February 13, 1967, the chairman of the Board announced that everyone would be given an opportunity to present evidence. There was no statement at that time that persons not represented by counsel would not be permitted to cross-examine. At the second night's hearing there was also exhaustive and extensive cross-examination of the applicants' witnesses. Indeed the cross-examination of the witnesses for the applicants occupies twice as much space in the transcript as does the direct examination of those witnesses.

In the case of *Hyson v. Montgomery County Council*, 242 Md. 55, 217 A. 2d 578 (1966), this Court considered the question of the right to cross-examine at a zoning hearing. In that case an attorney representing the proponents of a rezoning application requested that the right of "cross-examination on the material that has already been presented." When counsel was advised by the Board that it had not been the practice to permit this, counsel proceeded to offer testimony. Chief Judge Prescott, for the Court, stated the law as follows:

> "The authorities seem to be in accord that when an administrative board or agency is required to hold a public hearing and to decide disputed adjudicative facts based upon evidence produced and a record made, that a reasonable right of cross-examination must be allowed the *parties*. * * * We have no intention of attempting to promulgate a comprehensive rule respecting the type or the amount of cross-examination that the Council must provide at hearings on applications for reclassification. The rationale of the cases and authorities is that reasonable cross-examination, which is required for a full and true disclosure of the facts, having due regard to the circumstances of each particular

case, the nature of the proceedings, and the character of the rights which may be affected by it must be permitted; and that is as far as we are required to go at this time. (Emphasis supplied)." (242 Md. 67, 217 A. 2d 585-6).

In the present case, 72 of the protestants from the neighborhood were represented by counsel who exhaustively cross-examined all witnesses produced by the applicants. There were other persons present who were not represented by counsel but they did not specifically request any right for further cross-examination (other than Mr. Yost who was granted the right), apparently being satisfied that the searching cross-examination by counsel had satisfactorily brought to light any facts relevant or helpful to the cause of the protestants. As Chief Judge Carter aptly stated in his written opinion filed in the lower court:

"To hold that the Protestants present who were not represented by counsel, which probably represented a considerable number, should have each been afforded the right of further cross-examination of the several witnesses produced by the Petitioners would *likely have protracted* the hearings to an unreasonable extent without developing any new material facts. Certainly in the interest of orderly procedure some limitation on the right of cross-examination had to be invoked in a situation such as was here presented. We find, therefore, that the restriction of the right of cross-examination to counsel was reasonable 'having due regard to the circumstances of (this) particular case, the nature of the proceedings, and the character of the rights which (might) be affected' and that such restriction did not violate the fundamentals of natural justice or fair play, nor deny any Protestants present who did not have counsel the right to have full and fair disclosure of the facts testified to by witnesses for the Petitioners." (Emphasis supplied.)

Assuming, without deciding, that the protestants who were not represented by counsel were parties aggrieved who might, under certain circumstances, be entitled to cross-examine,

we are of the opinion that any such persons who did not specifically request the right to cross-examine have waived it. Although it is true that the chairman indicated at the first hearing that cross-examination would be conducted by counsel for the parties represented by them, it is clear from the proceedings at the second hearing that the chairman did entertain a request to cross-examine and ultimately granted it to Mr. Yost. Any other persons who were not represented by counsel, or who were not themselves members of the Bar, were obligated under the circumstances of this case to request the right to cross-examine in order to preserve whatever rights they might have to cross-examine. See *Bayer v. Siskind,* 247 Md. 116, 230 A. 2d 316 (1967). See also *Overton v. Board of County Comm'rs of Prince George's County,* 223 Md. 141, 162 A. 2d 457 (1960).

In our opinion, the Board did not deny due process of law to any protestants not represented by counsel so far as any right of cross-examination is concerned.

2.

The appellants also urge upon us that the Board denied the appellants due process of law by not providing a hearing area at the first zoning hearing sufficiently large to accommodate all persons who wished to attend. We do not agree.

The chairman of the Board testified at the hearing in the circuit court that ordinarily the Board met in a small room but that, in this case, the Board anticipated that the hearing would be larger than usual and made arrangements for a larger hearing room. The Board did not anticipate that as large a number of persons would attend the hearing as actually did attend it. It was estimated that approximately 150 persons wished to attend the first hearing and that a least 50 were unable to get into the hearing room because the room was not physically large enough to hold them. There was evidence that those who could not enter the room could not hear the testimony or the questions asked by counsel. The larger room which the Board obtained contained approximately 1500 square feet and was the county auditorium. The second hearing on February 13, 1967, and the third hearing the following day, were held in the auditorium of one of the high schools which was large enough to accommo-

date the crowd. As Judge Carter pointed out in his opinion, the testimony and proceedings at all sessions were recorded on tape and this tape was available to any interested party for the proceedings held on the first meeting for a full week between the date of that hearing and the second session on February 13. This tape was at the reporter's office in Easton and could have been replayed to any person wishing to hear the proceedings upon the request to the secretary or to the chairman of the Board. No one present at the first hearing made such a request. Judge Carter properly stated in his opinion:

> "Measured by the rule implicit in the *Hyson* case, supra, aforesaid, we find no failure by the Board to conduct the first hearing with fundamental fairness and fair play and no denial of due process on the ground that interested parties were denied the right to rebut or explain adverse testimony or to be fully informed as to the evidence upon which the Board based its decision."

Here again, if there were any merit in the contention of the appellants in regard to this point (and we do not think there is any) none of the appellants not represented by counsel has shown that he or she was not present at any of the hearings. The record indicates that all of the appellants now before this Court except Aveley Corporation and Frank J. and Margaret Hannan were represented by counsel who, of course, were present at the first hearing as well as at the subsequent hearings, and heard all of the testimony. There is no evidence of record to establish whether the Aveley Corporation and the Hannans attempted to attend any of the hearings or whether they joined in the appeal to the circuit court after the Board's decision. There is, therefore, no evidence in the record to show that these three appellants were denied due process of law because of the manner in which any hearing in which they were present was conducted. It is clear to us that the appellants who were represented by counsel at all the hearings have no basis for complaint and the appellants of record on this appeal cannot represent persons at the hearing who are not parties to the appeal in the circuit court or in this Court. See *McBriety v. Baltimore City,* 219 Md. 223, 148 A. 2d 408 (1959).

It seems clear to us that the procedure employed by the Board in the conduct of all hearings before it did not violate the requirements of fundamental fairness or due process of law and that, in any event, none of the appellants was eligible to assert any complaint in regard to the hearings in this appeal.

3.

We now come to the most important question raised by the appellants, namely, that there was not sufficient evidence to support the Board's action in granting the special exception. The determination of this issue requires a further statement of facts in addition to those already stated.

The application for the special exception indicated that Kirkland Hall would be used as a private school. The testimony in regard to the contemplated use established that the applicants hoped to enroll approximately 200 students the first year of the operation of the private school and ultimately hoped to have as many as 400 students at the school at one time. The exception granted by the Board restricted the number of students at any one time to 400. The applicants expected that the school would become an accredited junior college so that a boy finishing two years at the school would be eligible to enter a four year course of instruction of higher learning as a junior although there is no guarantee that this result could be accomplished. It is intended that the school will solicit the attendance of boys of high moral character with outstanding qualities of leadership but who may have had difficulty in absorbing academic instruction. The policy of the school will be to give these boys a liberal arts course on a personalized basis of not more than 8 to 10 students for each instructor. The instructors will concentrate on the development of leadership. It is further contemplated that prospective students for the private school will be developed by mailing information concerning the school to approximately 5,000 headmasters of other private schools throughout the United States soliciting the recommendation of the headmasters of boys having a high school education or its equivalent who have the qualities which meet the criteria established at Kirkland Hall. The applicants indicate that they would not accept any student who is not recommended by a headmaster as meeting this criteria. The annual tuition will be $4,000.

The testimony indicated that the activities at the school other than academic study will consist of instruction in water skiing, sailing and swimming. There will also be activites in football, soccer and track on the athletic field. There will be no tickets sold for any contest held at the school, no stadium will be built and no night activities will be held at the school. There will be no outside lights at night except for purposes of security and there will be no loud speakers outside the buildings. There will also be no boats or automobiles allowed to any student. It is expected that transportation to and from the school will be supplied by a bus and a stationwagon operated by the school. It is the hope of the applicants that the school will qualify as a part of the Naval Reserve Officers Training Corps program which will require one or two hours a week of naval training with uniform with the remaining portion of the training being conducted on vessels away from the school. It is contemplated that no real guns will be used in the training program and that flying instruction to students desiring it will be made available at a flying school in Florida.

The dormitory dining facilities and athletic area are planned to be erected in the general area of the main residence at Kirkland Hall which means that they will be located approximately 1,000 feet from the property line of the property of the Aveley Corporation, occupied by the Gibsons, and approximately one mile from the residence on the property of those appellants. Instructors will be quartered at the school and these instructors will be able to control the students. Any use of Kirkland Hall as a place for water skiing or similar activities will be supervised with at least two people in each boat as required by the state law and these activities will be conducted in the wide water of the Miles River.

Philip G. Hall, a witness for the applicants, testified that his profession or occupation was that of waste disposal. He testified that an agent of the State Department of Health had asked him to be present at the hearing on February 6. He testified that he had a plan or design in mind for Kirkland Hall for waste disposal. This was an extended aeration compaction plant that accomplishes primary and secondary treatments of domestic waste. This type of plant had been used on similar projects within the

State, the nearest one to Kirkland Hall being at the Mardela School at Mardela Springs, Wicomico County, Maryland. He estimated that the plant would take care of 30,000 gallons a day, whereas the Mardela School plant took care of 15,000 gallons a day. He testified that, in his opinion, the contemplated plant would adequately take care of the problem that the school would have at Kirkland Hall and that such a plan would have to be approved by the State Department of Health. This approval would depend on the degree of treatment that would be required by the State Department of Health and would be conditional upon the receiving waters. The effluent would be dispersed into one, two or three waters and the degree of treatment would have to be comparable so that there would not be any detrimental effect on the water.

David Auld, a civil and sanitary engineer, testified for the appellants that a population of 400 students and 200 supporting personnel would require 50,000 gallons of water a day for waste alone and that the water demand would be further increased for irrigation, watering and outside uses. There was also some testimony that the water level in the area has dropped considerably in the past few years and that several people in the neighborhood have had to deepen their wells.

In regard to sewerage and water supply, the appellants earnestly contend that the Board cannot, in effect, abdicate its function to find that the proposed sewerage plant would be adequate because such a plant would be required to have the approval of the State Department of Health. Assuming, without deciding, that the Board must determine this issue, in our opinion, the evidence was sufficient to support the Board's finding that there would be no injury to the health and safety of the residents and workers in the area, and that the proposed use would not be detrimental to the use and development of adjacent properties in the general neighborhood.

In regard to traffic, the applicants estimated that they would have a staff of 20 instructors and half of the instructors would be older men who would probably rent houses in Easton or Oxford. As we have indicated, the testimony established that school vehicles would be limited to one bus and one station-wagon. The Board found that there would be no nuisance created be-

cause of traffic. We do not find it necessary to review in detail the other evidence in regard to traffic which, in our opinion, is sufficient to support the Board's finding that there would be no nuisance resulting from traffic.

The uncontradicted evidence of Francis G. Bartlett, Jr., a real estate broker operating in Talbot County, with 20 years of experience in the real estate business, indicated that there was excellent visibility approaching or leaving Kirkland Hall; that he did not believe that the establishment and operation of the school would adversely affect the general plan for the physical development of the county but, on the contrary, is a use which would increase the value of the surrounding real estate; that the proposed use would not be detrimental to the use or development of adjacent properties or the general neighborhood and that Perry Hall along the waterfront had already been laid out into 17 waterfront lots; that he did not believe the proposed use would consitute a nuisance by reason of noise because the school is remote and secluded; that there would be no nuisance from traffic because of the extensive visibility of the entrances; and that the proposed use would not adversely affect the properties lying across the river.

The Board in its decision, approving the special exception for the private school use at Kirkland Hall, made the approval subject to the following conditions, standards, safeguards and rules:

"(1) No playing field, tennis court, arena, bleachers or grandstands shall be erected or maintained closer than one hundred (100) yards to any boundary of the subject tract or to Route 33.

"(2) No rifle, pistol, skeet or trap shooting range or facilities shall be used or maintained.

"(3) No building shall be constructed which exceeds two stories in height.

"(4) No public address or electronically amplified music system shall be used out-of-doors, except during daylight hours, and only then, in conjunction with a sporting event and so long as the same does not constitute a public nuisance.

"(5) No illumination of playing fields, tennis courts or arenas shall be permitted.

"(6) The student population shall be limited to a maximum of four hundred (400) persons.

"(7) No power boat contests upon the waters of the Miles River and its tributaries shall be sponsored, conducted or permitted by the school, its faculty or students.

"(8) No land or sea aircraft shall be permitted to land or take off from the subject tract or the waters contiguous thereto.

"(9) Water skiing for instructions and/or pleasure, by faculty and students, shall be conducted and permitted only in the broad waters of the Miles River to the West and Southwest of 'Kirkland Hall,' and is absolutely prohibited in Moreland Creek and in the narrow reaches of the Miles River Northeast of the school, or in any place where the wake created therefrom would create a real and actual danger to moored or anchored vessels.

"(10) Garbage and trash disposal facilities shall be such as meet all State and County sanitary regulations, shall not create a public or private nuisance by reason of smoke, fumes or noxious odors, and shall be screened from view of the neighboring properties, the public road, the Miles River and its tributaries."

The decision of the Board was unanimous.

The trial court did not consider any of the evidence made known to the Board upon its inspection of the property so that there is no issue before us in regard to whether or not such evidence could be properly the basis for the Board's decision without having been specifically mentioned by the Board at the hearing in the case. H. T. Slaughter, a County Commissioner for Talbot County, testified that the County Commissioners for Talbot County some years before had designated Kirkland Hall as one of four desirable areas in which a branch of the University of Maryland could be placed in Talbot County. This determination by the County Commissioners, as indicated, was reached

substantially before the present application was made for the private school at that location.

Without further prolonging this opinion, it is clear to us that Judge Carter properly found that there was sufficient evidence to support the findings of the Board upon which its approval of the special exception in this case with the ten limitations mentioned was granted and that the Board's action was correct.