FORD ET AL. t/a Pot Spring Joint Venture *v.*
BALTIMORE COUNTY, MARYLAND

[No. 163, September Term, 1972.]

*Decided February 9, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*W. Lee Harrison* for appellants.

*Harry S. Shapiro, Chief Assistant County Solicitor,* with whom were *R. Bruce Alderman, County Solicitor,* and *Thomas J. Aversa, Jr., Assistant County Solicitor,* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

In this appeal from the Circuit Court for Baltimore County, in equity (Menchine, J.), two questions are presented to us: (1) is Council Bill No. 30 of the 1971 legislative session of the County Council of Baltimore County adopting new zoning regulations and new comprehensive zoning maps unreasonable, illegal, arbitrary and unconstitutional as applied to the property of the appellants, Eugene F. Ford, et al., trading as the Pot Spring Joint Venture and (2) were the appellants denied a full, fair and impartial hearing in regard to a proposed reclassification of their property?

The appellants, plaintiffs below, filed a bill of complaint on May 7, 1971, against Baltimore County, the appellee in this Court, praying, *inter alia,* for a declaratory decree that Bill 30 was invalid and unconstitutional as applied to the subject property and that the property retain its prior zoning status. After the County answered, substantial testimony was taken and a number of documents, maps, plats, etc. were introduced into evidence. The chancellor on February 9, 1972, filed a written opinion indi-

174

cating that Bill 30 was valid as applied to the subject property and on February 22, 1972, passed an order denying the relief prayed for by the plaintiffs, who filed a timely appeal from that order to this Court.

The subject property consists of 32.603 acres of land located at the southwest corner of Pot Spring and Cinder Roads in the Eighth Election District of Baltimore County. The original comprehensive zoning map for this area was adopted on December 20, 1955. It was the result of that comprehensive zoning plan that 11.323 acres of the subject property were zoned R-20 (single family houses on 20,000 square feet lots) ; 1.225 acres were zoned R-40 (single family houses on 40,000 square feet lots) and 20.125 acres were zoned B.L. (Business Local). When this original comprehensive zoning was adopted in 1955, the surrounding area was relatively undeveloped. It was, however, located in an area which was on the brink of an intensive development which had been spreading northward from the Towson area for several years prior to 1955. The entire neighborhood in which the subject property is located was zoned for single family houses, ranging from the R-10 zone (one-quarter acre lots) to the R-40 zone (one acre lots) with the exception of two tracts—one, the subject property; the other, a four acre tract approximately one-half mile south of the subject property on the west side of Pot Spring Road which was zoned B.L.

The uncontradicted evidence produced by the property owners in the trial court indicates that the neighborhood had developed in accordance with the comprehensive plan adopted in 1955. A school had been constructed on land abutting the subject property on the southwest; the four acre commercial tract had been improved in accordance with its B.L. classification; and, other properties in the general area had been developed with substantial and expensive residences. Indeed, virtually all of the land in the area had been developed in accordance with the 1955 comprehensive plan except the subject property.

The testimony further indicated that the subject property had certain topographical and other conditions having a direct bearing on its development. These same conditions existed or were known in 1955 and they exist today. One of the most important of these conditions is the fact that the subject property is traversed by two streams (and attendant flood plains) which carry water from open end outlets from the County storm drainage systems in neighboring developments. These outlets involve storm drainage pipes 36 and 66 inches in diameter, respectively. The water from these two pipes crosses the subject property and leaves it by passing through two undersized culverts under Pot Spring Road. During heavy rainfall, the subject property is flooded because of the inadequate culverts.

Since the adoption of the comprehensive plan in 1955, Pot Spring Road has been widened and improved southerly from the subject property and northerly from Cinder Road, but the portion of that road contiguous to the subject property has not been improved. Any development of the subject property will require the widening and repaving of this section of Pot Spring Road with the construction of new and larger culverts, to the cost of which, the developer must contribute.

The testimony established that although the procedural requirements for the adoption of the 1955 comprehensive plan and those for the adoption of the 1971 comprehensive plan were generally similar, there were several substantial differences. Both the 1955 and 1971 comprehensive plans were initiated by the County Planning Board, which it had adopted after conducting public hearings in regard to the respective plans. In 1955, the recommendations of the Planning Board in the form of a map were submitted to the Zoning Commissioner. The Zoning Commissioner then conducted hearings, made whatever changes he thought to be appropriate, and thereafter submitted the map, as amended, as a final recommendation to the Board of County Commissioners. The County

Commissioners also conducted a public hearing on the recommended map and then made any changes the County Commissioners deemed appropriate as a result of that hearing. In 1971, however, as a result of intervening changes in the local law, the recommendations of the Planning Board in the form of a map were submitted directly to the County Council, the Zoning Commissioner's former function having been eliminated. However, before the County Council could make any changes or alterations in the recommendations of the Planning Board, it was required that the County Council have additional public hearings at which issues were restricted solely to those properties in regard to which the County Council proposed or recommended zoning which was different from the zoning recommended by the Planning Board. The County was divided into five sectors and the public hearings by the County Council were held on each sector individually. The subject property was designated as being in the Central Sector, so that in the present case, we are only concerned with the councilmanic hearings for that sector. We reviewed in detail the applicable statutory provisions in Baltimore County in regard to the required procedure for adoption of the proposed comprehensive zoning and zoning maps in 1971 in *Nottingham Village, Inc. v. Baltimore County,* 266 Md. 339, 292 A. 2d 680 (1972), and need not repeat that review here. We sustained in *Nottingham Village* the provision in the Baltimore County Code (1968, as amended) in which subsection (b) had been added by Council Bill No. 103, possibly as a result of our decision in *Swarthmore Co. v. Kaestner,* 258 Md. 517, 266 A. 2d 341 (1970). Subsection (b) provided:

"(b) Any change or amendment to be made in a zoning map as proposed by the planning board shall, before final adoption of such map, be brought to further public hearing, advertised and held in the same manner as provided above in subsection (a). If further changes or amend-

> ments to such map shall then be proposed in the county council, a final public hearing, limited to such further changes or amendments, shall be advertised and held in the same manner as provided above before final action on such map is taken by the county council."

It will be noted that the provisions of subsection (b) are mandatory.

In *Nottingham Village,* we also sustained, as not inconsistent with Art. III, § 303 of the County Charter requiring the County Council to act as a body and forbidding the creation of standing committees or delegation of council functions and duties to a smaller number of its members than the whole, the agreed upon practice of the County Council in giving the councilman in the councilmanic district involved the primary responsibility for "closing" the issues, *i.e.,* the identification of the Planning Board's recommendations which should be adopted. Judge Singley, for the Court, stated on this point:

> "What happened was essentially this. While the Council toured each of the five sectors by bus, it was decided that each councilman would be primarily responsible for zoning in his councilmanic district. After the first Council hearing, it became the councilman's duty to recommend to the Council which issues should be 'closed,' in other words to identify those instances in his district where the Planning Board's recommendation should be adopted, thus making unnecessary a second public hearing. It would seem that the Council members interacted as a group, but without formal vote, in the construction of the 'log,' or list of issues recommended for consideration for the second hearing. By this procedure the number of issues was reduced from some 700 to about 200. On

24 March 1971, the Council acted as a body in closing issues.

"As a practical matter, what was really done was to assign to each councilman responsibility for the ascertainment of facts in support of a recommendation which would form a basis for Council action. We find nothing in Art. III, § 303 of the Charter or in Title 22, § 22-21 which proscribes this. The Council acted as a body in adopting Zoning Maps."
266 Md. at 349-50, 292 A. 2d at 685.

The appellants had also challenged in their bill of complaint the general validity of the adoption of the 1971 comprehensive zoning plan; but they abandoned this contention after the decision in *Nottingham Village*.

We now turn to the hearings held in regard to the Central Sector, which, as we have observed, included the subject property.

The first hearing by the County Council in regard to the Central Sector was held on January 11, 1971. At that time, the Planning Board recommended to the Council that most of the B.L. zoning of the subject property be continued, but with certain minor adjustments to be made on the boundaries of that zoning in order to form larger buffer strips or setbacks for the protection of the properties in the neighborhood which had developed residentially in accordance with the 1955 comprehensive zoning and map. On January 4, 1971, the then counsel for the appellants wrote a letter to the County Council, protesting against the adjustments recommended by the Planning Board, indicating that they were illegal and confiscatory and were "for the apparent purpose of accommodating the neighbors." This letter was submitted to the County Council prior to the hearing on January 11. At that hearing two owners of residential properties in the general neighborhood testified. The testimony of one of the witnesses was principally in regard to the already developed four acre commercial site located ap-

proximately one-half mile from the subject property and to the distances of other shopping facilities in the general vicinity. His testimony, however, concluded with the request that all of the subject property be zoned for residential uses. The other witness spoke upon a number of issues but also recommended the "down shift" of the subject property to residential uses.

After the hearing of January 11, 1971, the subject property was designated as an "open issue" for the hearing of the County Council scheduled for March 10, 1971. This designation resulted from a recommendation by Councilman G. Walter Tyrie, Jr.—the councilman in whose councilmanic district the subject property is located—that the subject property be zoned in its entirety to the D.R.-2 zone. The D.R.-2 zone provides for a density residential use in which two dwelling units per acre are permitted. A limited number of compatible commercial uses are permitted if a special exception is obtained, such as antique stores, restaurants, kennels, riding stables, shooting ranges, and the like. A shopping center is not permitted.

The March 10, 1971, hearing at the Dulaney Senior High School convened at 7:00 p.m. and lasted until 3:00 a.m., the following morning. So many people attended the meeting that many persons could not get into the building and others could only get into the lobby. The aisles were blocked by people standing, lying and sitting in the aisleways so that it was next to impossible to get to the speakers' rostrum, nor could the speakers who managed to reach the rostrum be heard or make an intelligible talk because of the booing, hooting, catcalling and other shouting. Indeed, Councilman Tyrie was hanged in effigy from the balcony of the building while other people paraded in front of the building, displaying simulated tombstones (Councilman Tyrie sells gravestones), coffins and banners containing derogatory remarks about him. Councilman Tyrie in his testimony admitted that his safety and that of his children had been threatened,

necessitating a request by him to the police for protection after the March 10 hearing and prior to the County Council's action on March 24, 1971, approving his recommendation that the subject property zoning be made entirely D.R.-2.

An alternative method of communicating with the County Council was provided at the March 10 hearing, *i.e.*, to complete a form provided for that purpose and submit it to representatives of the Council or of the Planning Staff who were seated at locations throughout the lobby of the school. Such a comment sheet was completed by counsel for the appellants but Councilman Tyrie testified that he had not seen it. It was stored along with thousands of other written requests in cardboard cartons in the County Office of Planning and Zoning. One of the witnesses who had appeared at the January 11 hearing also appeared at the March 10 hearing. He spoke briefly, principally expressing his gratitude to Councilman Tyrie for his recommendation that the subject property be rezoned to D.R.-2. Frederick P. Klaus, a real estate expert who later testified for the appellants, attended the March 10 meeting, in addition to counsel on behalf of the appellants. He arrived at approximately 6:50 p.m., found it impossible to reach the Speakers' Rostrum, and finally left at about 11:00 p.m. Counsel left about the same time. We will give the details of Mr. Klaus' testimony in regard to the March 10 meeting later in this opinion.

After the 1955 comprehensive plan was adopted, there were at least two changes in the ownership of the subject property. In 1966, two well-known builders and developers, James Keelty and James Dorment, controlled the ownership of the property. The appellants purchased it from them in 1966 for $400,000. The existing B.L. zoning was an important factor in reaching this purchase price. After the purchase of the property, development of the tract was delayed by several factors, one being the suicide of one of the three original partners, with a resulting delay in clearing up the affairs of the

partnership and the acquisition of the interest of the deceased partner by the surviving partners. Between the time of acquisition of title to the subject property and June, 1970, the appellants began to process the development plans for the property. At the suggestion of George E. Gavrelis, then County Director of Planning, the appellants did not proceed with their development plans but instead submitted a petition to reclassify the property to the R-A (Apartments) zone. Substantial neighborhood opposition developed to the granting of this petition and it was withdrawn.

As a result of engineering studies which were begun in 1967, a preliminary plan for the development of the subject property was filed with the County on December 7, 1970. The Joint Subdivision Planning Committee of the County, on December 17, 1970, issued its comments and the appellants were advised that there would be a meeting within 10 days between the County's Director of Public Works, Bureau of Traffic Engineering and the Director of Planning to decide whether the appellants would be required to extend Medbury and Northleigh Roads or whether these public roads would be terminated at the boundaries of the subject property. This meeting, however, was never held. The engineer for the appellants on March 3, 1971, submitted a Public Works Agreement to the County for the development of the subject property in accordance with the existing zoning. In the meantime, there was a meeting between representatives of the appellants and the Director of Planning which resulted in revisions in the development plan incorporating in it the setbacks desired by the Department of Planning and by the Planning Board so that the plan was brought into compliance with the recommendations of the Planning Board submitted by it to the County Council in connection with the proposed new comprehensive zoning plan. Then, on March 8, 1971, the appellants filed an application for a building permit with the County, paying a building permit fee of $430 on the following

day, March 9. At the same time inquiry was made to the Director of Planning in regard to why the preliminary development plan had not been approved by him and the Director of Planning indicated that he would sign it if it were resubmitted to him. When this was done, however, the Director of Planning refused to sign an approval because, he testified, he had been instructed by the County Council, through its Chairman, that no development plans where there was a possible conflict with a resolution of the zoning issue, should be approved until "such time as the Council had resolved the zoning issue." The County Council had knowledge of the building permit application and had instructed the Director of Planning not to approve the application. The appellants finally did receive comments from the Bureau of Public Services shortly after March 16, 1971; but these comments related to the plat which was submitted and was the subject matter of the comments of December 17, 1970, and did not relate to the revised preliminary plan submitted on January 22, 1971.

The County Council on March 24, 1971, adopted a new comprehensive zoning plan which eliminated the B.L. zoning on the subject property and placed it in a D.R.-2 zone.

At the time of the adoption of this new zoning for the subject property, the testimony introduced on behalf of the appellants indicated that they had either expended or obligated themselves to spend some $675,000 in connection with the acquisition and development of the subject property. The chancellor found that the total cost to the appellants of the subject property at the end of 1971 was $613,447, which we will accept as the correct figure for the purposes of this opinion. John Hocheder, Jr., a well-qualified land development engineer, testified for the appellants that the development costs of the subject property would not be substantially different if it were developed under the B.L. zoning or under the new D.R.-2 zoning. He testified that although the D.R.-2 zone would theoretically permit 65 or 66 lots for individual cottages,

the physical characteristics of the subject property would prevent a yield of more than 45 lots on the entire 32.603 acres in the tract. He further testified that it would be possible to develop the tract by erecting 65 apartment units under the cluster form of development. His estimate of the development costs for the 45 lots amounted to $342,732 or a cost for each lot of $7,620. He stated that the normal acceptable development cost for each lot in a D.R.-2 zone would be approximately $4,000 per lot and that any development cost in excess of $4,500 per lot would be excessive. His estimate of the development costs of the subject property with 20 acres of it developed in accordance with the requirements of the B.L. zone was $312,169; and such costs for the development of the tract into 65 apartment units were $359,000 or a unit cost of $5,525 for each of the apartment units, provided the entire 65 apartments did not average more than two bedrooms for each apartment. If, however, the project was constructed with three bedroom units, the yield would only be 43 apartments, the average cost of each apartment being then in excess of $8,300 for each apartment. It was Mr. Hocheder's opinion that, as a general rule, the average development cost for apartment land should not exceed $1,000 per unit and could not reasonably be extended beyond $1,500 per unit. His ultimate conclusion was expressed in the following testimony:

"Q. All right, now, Mr. Hocheder, as a civil engineer engaged in the designing of developments, both apartment and of cottages, would you advise your clients in this case to undertake the development of this property for, either, individual cottages within the DR-2 zone or for apartments within the DR-2 zone? A. I think I have already stated that it is way out of the economic limits that we advise our clients for. In fact, it is almost twice as much, so, therefore, I would consider it economic suicide if they did it.

"(The Court) What do you mean by economic suicide? A. Well, it would just cost too much. They would be better to leave the thing go for taxes, really than try to develop it."

Mr. Hocheder's analysis of the costs and his opinions were substantially confirmed by the testimony of Frederick P. Klaus, a well-qualified real estate expert who testified for the appellants and who, as we have noted, attended the "hearing" of March 10, 1971, on behalf of the appellants. Mr. Klaus agreed that the subject property could be developed in either 45 single family, detached houses or in 65 clustered apartments. He was of the opinion that the tract was less valuable for apartments, having a fair market value of $97,500 for that purpose, than it was for development within the D.R.-2 classification for individual homes, the latter use resulting in a fair market value of $112,500. He estimated the financial loss to the appellants—assuming an ultimate total development cost of $700,000—to be $603,500 if sold for apartments and $587,000 if sold for individual lots within the D.R.-2 zoning. In his opinion, it was not financially possible for the owners to develop the subject property under the D.R.-2 zoning. He stated: ". . . it would be a terrible loss. He would be better off leaving it to go for tax purposes" or rather for "foreclosure."

Bernard Willemain, a highly qualified land planner and who had been employed by the County in the formation of the 1955 comprehensive plan, testified as an expert witness for the appellants. He testified that there had been no significant changes within a radius of two miles of the subject property, including zoning changes, legal changes or physical changes which would indicate any departure from the 1955 comprehensive plan. He stated that there had been absolutely no change in the character of the neighborhood as delineated on the comprehensive map. Development, he said, had closely followed the original comprehensive zoning plan and the original master plan, the subject property being the only

significant unimproved land in this part of the community. In his opinion, there was nothing unusual in establishing business or commercial areas within a residential neighborhood, pointing out that there is substantial variety in the characteristics of such locations. He stated that, in regard to the subject property, there were unique characteristics relating to the drainage, the topography and the frontage that affects the feasibility of zoning or developing it for residential lots.

The appellants forcefully argued before us that under the unusual facts and circumstances in this case, Bill 30, as applied to the subject property, was unreasonable, illegal, arbitrary and unconstitutional. They base their argument principally upon two propositions, *i.e.*, (1) Bill 30 is unconstitutional as applied to their property as confiscation resulting in a taking without the payment of just compensation in that they are deprived of any *reasonable* use of the property, relying upon the principles established in our decision in *Frankel v. City of Baltimore*, 223 Md. 97, 104, 162 A. 2d 447, 451 (1960) and distinguishing *Baltimore City v. Borinsky*, 239 Md. 611, 212 A. 2d 508 (1965) and its progeny on the facts; and (2) Bill 30 is unreasonable, arbitrary and capricious as applied to their property resulting in a denial of due process of law in that the change of zoning from B.L. to D.R.-2 has no reasonable relationship to the proper exercise of the police power being contrary to the zoning established by the comprehensive zoning plan in 1955 without any change in the character of the neighborhood since the 1955 comprehensive zoning, contrary to the recommendations of the Planning Board and resulting in a crushing financial loss to the appellants without any established benefit to the community, relying upon our decisions in *Aspen Hill Venture v. Montgomery County*, 265 Md. 303, 289 A. 2d 303 (1972) and *Northwest Merchants Terminal v. O'Rourke*, 191 Md. 171, 60 A. 2d 743 (1948).

These are interesting questions but we do not find it necessary to decide them, inasmuch as we have con-

cluded that the appellants were deprived of a full, fair and impartial hearing as required in connection with the change of zoning of the subject property from B.L. to D.R.-2, so that the case must be remanded in order that such a hearing may be afforded to the appellants.

We indicated in *Swarthmore Co. v. Kaestner, supra,* that under Title 22, § 22-21 of the County Code, as it then provided, it was not required that the County Council have a *further or additional hearing* in regard to changes or amendments the Council might see fit to make even if contrary to the recommendations of the Planning Board presented to the Council and the subject of the *required first hearing.* As we have observed, however, shortly after *Swarthmore* was decided, the County Council enacted subsection (b) to § 22-21 by Bill 103 which in mandatory form *did require* a hearing if there was a proposed change or amendment to the zoning map recommended by the Planning Board. Although a second hearing is not required by Article 23 of the Declaration of Rights in the Maryland Constitution prohibiting a denial of due process of law, the County Council by enacting Bill 103 made the second hearing, with its provisions for notice, a requirement of due process of law so far as it related to the zoning of the individual tract involved. A second hearing then is a condition precedent for the validity of any change in zoning which differed from the comprehensive map recommended by the Planning Board.

When a hearing is required, it must be a fair hearing in all respects and not a mere form. *See Merritt v. Swope,* 267 App. Div. 519, 523, 46 N.Y.S.2d 944, 948 (1944). *See also LaPrade v. Department of Water and Power of City of Los Angeles,* 27 Cal. 2d 47, 162 P. 2d 13 (1945) ; *Morris v. City of Catlettsburg,* 437 S.W.2d 753 (Ky. 1969). As to the substance of a fair hearing, this Court has indicated:

"A statutory provision for a public hearing implies both the privilege of introducing evidence

and the duty of deciding in accordance with the evidence, and it is arbitrary and unlawful to make an essential finding without supporting evidence. This is especially true in zoning cases. . . ."
*Heath v. Mayor and City Council of Baltimore,* 187 Md. 296, 305, 49 A. 2d 799, 804 (1946).

*See also In re Kurren's Appeal,* 417 Pa. 623, 630, 208 A. 2d 853, 856 (1965), where the Supreme Court of Pennsylvania said: "A 'hearing' contemplates more than mere *attendance* by the public; it connotes a meeting which the public has the right to attend *and* the right to be *heard.*" (Emphasis in original)

From the record, it does not appear that the mass assembly of irate and disruptive citizens on March 10, 1971, satisfies the requirements of a fair hearing. Mr. Klaus testified in the lower court that he attended the public hearing:

"I arrived about five minutes before the meeting, actually, started which was, possibly, ten minutes or five minutes to 7:00.

"Q. And can you describe to His Honor the condition of the crowd that was in attendance? A. When I arrived, I had to park my car several blocks away because it was very, very heavily parked, and got into the front door, and before I got to the front door, I saw several demonstrations which were rather amusing, but I am sure, also, sad because the crowd was certainly maligning our councilmen from the Third District. We all know Mr. Tyrie's business is grave stones, and people had large signs up with grave stones, 'May he rest in peace, Jack Tyrie.' There were people walking around with paintings of coffins. Several younger people handed me literature, which I looked at and then discarded, about the fixes in Baltimore

County zoning, unquote, and the properties that they were most concerned with were the property on the west side of York Road known as the Williams property, and the second one that they were, really, vehement about was this commercial zoning in a residential zone which was the subject property.

"Upon getting inside, they had a series of maps along the walls leading into the auditorium, and I ran into, at least, ten people whom I had known in my real estate activities who asked me if I could please find their property on these maps because there were overlays and so on. Well, it was such a mob scene, such a crowd, that it was almost impossible to get close. I then attempted to get into the hall, and this was after the meeting had started because they had a microphone outside in the hall, and I could hear that the meeting had started. I think it was about twenty minutes after the meeting started I tried to attempt to get into the hall and get towards the front. Well, the structure, the auditorium was built on many levels. It was built for, I guess, mass meetings of these students, plays and so on, so it wasn't a flat floor that you walked on. There were steps going down towards the stage. The two aisles that I attempted were fully occupied by people sitting in the aisle, and I, actually, observed two ladies lying from one step over the next to the next in a criss-cross pattern, and I didn't feel like stepping over them, so I did not proceed to the front of the room which I attempted to do.

"Q. Was the rostrum at the front of the room? A. Yes.

"Q. Down by the stage, I mean? A. Yes. The balcony was, also, filled with people making very

bad remarks, and signs about Mr. Tyrie's business and his councilmanic activities, et cetera, et cetera. There were some speakers whom I could not understand because of the boos and claps. If someone got up and said something against something that the crowd agreed with, there was a great hoorah, and if something was said to disagree with, there was a great boolah. As I said to you the other day when you asked me, if I recall, it reminded me of the fourth day of the Oktoberfest as I recall Oktoberfest in Munich when everything just, like, goes berserk. Consequently, it was a mass mob meeting, and I don't think that of the things that were said, at least I couldn't make any intelligence of any of them because I was, as I say, in the back of the room. I couldn't get to the front.

"Q. To your knowledge were other people prevented from getting to the rostrum to speak by the crowd? A. Yes, you were because you were right next to me."

On cross-examination on this point, Mr. Klaus stated:

"Q. Now, going to the March 10 public hearing, you said it was crowded. What time did you leave? A. I left about 11:30 or thereabouts because I drove back to the Quill Club to have a nightcap.

"Q. And you are aware that the meeting was, actually, going on until 1:00 or 2:00 a.m. in the morning? A. That is what I heard, Mr. Tyrie say.

"Q. And you said there were people in the aisle which discouraged you from going to the front, so I think your statement was that you did not desire to step over the ladies. There was nothing which prevented you from stepping

over the ladies in order to go up front, was there? A. Except I am a born gentleman. I don't do things like that.

"Q. Did you ask her if you could pass around her or over her? A. I think she was rather hostile to anyone going towards the front.

"Q. She didn't have a gun, did she, Mr. Klaus? A. They had a couple of coffins outside.

"Q. Do you know what time Mr. Harrison [counsel for the appellants] left? Did he leave with you? A. No, sir, he did not.

"Q. Did he leave earlier? A. Mr. Harrison and I separated after our futile attempt to get to the front, and some people came to him as they came to me, and we were discussing this holocaust that was going on.

"Q. Did you see Mr. Harrison when you left? A. No.

"Q. You didn't see him around when you left? A. No."

This testimony is uncontradicted.

Other courts, faced with similar facts, have held the action of the convening authorities to be invalid. In *American University v. Prentiss,* 113 F. Supp. 389, *aff'd* 214 F. 2d 282 (D.C. Cir. 1954) Judge Holtzoff struck down a rezoning by the District of Columbia Zoning Commission as being arbitrary and capricious, and specifically noted:

"[T]he atmosphere of the proceeding [by the Zoning Commission] was not conducive to calm deliberation. Several organized bus loads of angry property owners filled the hearing room and frequently interrupted witnesses and counsel by booing and hissing, or applauding. * * * The testimony consisted chiefly of emotional outbursts on the part of individual homeowners. . . ."
113 F. Supp. at 392-93.

In *Certain-teed Products Corp. v. Paris Township,* 351 Mich. 434, 88 N.W.2d 705 (1958), the Zoning Board of the township denied an application for a special exception to build a manufacturing plant in an industrial zone. The Supreme Court of Michigan overruled the denial, stating that the Board had acted "under the impact of a completely committed audience reaction." The court observed that "the audience came thoroughly committed to blocking the construction of this plant," and because each board member was forced to identify himself and his length of time in office "the crucial decision . . . was made by five members of the township board under the immediate impact of their constituents." 351 Mich. at 446, 88 N.W.2d at 711-12. The court concluded: "It is apparent to us from this record that plaintiff-appellant never had other than a cursory (even though formally courteous) hearing before the township board." 351 Mich. at 448, 88 N.W.2d at 712. We would be hard pressed to say that appellants here even received a "formally courteous" hearing. As our predecessors have cautioned, the exercise of the police power in zoning regulations cannot be governed "by a plebiscite of neighbors or for their benefit." *Benner v. Tribbitt,* 190 Md. 6, 20, 57 A. 2d 346, 353 (1948).

We find the case at bar to be clearly distinguishable from *Gibson v. Talbot County,* 250 Md. 292, 300, 242 A. 2d 137, 142 (1968) where we held it was not a violation of due process to provide a hearing area which was too small to accommodate all persons who wished to attend. In *Gibson,* after it was discovered that the first hearing area was inadequate, larger areas were used in conducting subsequent sessions. Also, all testimony was taped and available for any interested party who wished to be fully informed of the evidence before the board, so that the right to rebut or explain adverse testimony was not denied. In the instant case, however, it may well be argued that the appellants were, in effect, denied the right to be heard and rebut any evidence presented be-

fore the board on March 10, 1971. *Compare Bayer v. Siskind,* 247 Md. 116, 123, 230 A. 2d 316, 319 (1967).

It may well be that under the conditions surrounding the supposed public "hearing," it was in reality no hearing at all but rather a rowdy and uncontrolled mob making any intelligent presentation or discussion of issues or giving of testimony practically impossible. We do not find it necessary to decide this, however, inasmuch as, assuming for the argument that Mr. Klaus and counsel for the appellants possibly could have stayed after 11:30 p.m. and might have been able to present the position of the appellants prior to the end of the "hearing" at 3:00 a.m., nevertheless, an alternative method of presenting views and facts to the County Council was provided by use of the form entitled "Comment Sheet." These comment sheets were used to inform the County Council of the position of, or facts to be given by, the prospective witness filling out the form. This form specifically represented: "NOTE: This information will become an official part of the record of the meeting on this sector."

Such a comment sheet was completed by counsel for the appellants and duly filed with those who were designated to receive it. The uncontradicted evidence, however, established that Councilman Tyrie never saw it and it is clear that if he did not see it, neither did the other councilmen inasmuch as he was responsible for the issues in the Central Sector. Councilman Tyrie also frankly stated that he never saw any plans for the development of the subject property, did not know what stage the appellants had reached when the County Council took action on the map, never investigated what development costs would be for the subject property within the D.R.-2 zone, and had no idea how much money the appellants had invested in the property at that time. The evidence also indicated that the comment sheets were stored in boxes in the Office of Planning and Zoning.

It is apparent that the appellants were never "heard" in regard to their opposition to the proposed zoning of

a portion of the subject property from the B.L. zoning recommended by the Planning Board to the D.R.-2 zone. The subsequent attempted action of the County Council upon this issue, therefore, was void because of the failure to give the required hearing—a condition precedent to valid action by the County Council. Consequently, the case must be remanded to the lower court for the passage of an order directing the County Council to afford the appellants a proper hearing and for further proceedings thereafter.

> *Case remanded in accordance with Maryland Rule 871 without affirmance or reversal for the passage of an order directing the County Council of Baltimore County to afford the appellants a proper hearing in accordance with this opinion and for further appropriate proceedings thereafter, the costs to be paid by the appellee, Baltimore County.*