## STATE DEPARTMENT OF HEALTH
### ET AL. *v.* WALKER

[No. 230, September Term, 1964.]

514

*Decided May 4, 1965.*

The cause originally was argued before HAMMOND, HORNEY, SYBERT, OPPENHEIMER and BARNES, JJ., and reargued before the entire Court.

*Louis E. Schmidt, Special Assistant Attorney General* (on both arguments), with whom was *Thomas B. Finan, Attorney General,* on the brief, for the appellants.

*Raymond S. Smethurst, Jr.* (on both arguments), with whom were *Adkins & Potts* on the brief, for the appellee.

MARBURY, J., delivered the majority opinion of the Court. HORNEY, SYBERT and OPPENHEIMER, JJ., dissent. Dissenting Opinion by OPPENHEIMER, J., at page 524, *infra.*

This is an appeal by Dr. Fred S. Waesche, Deputy State Health Officer for Worcester County, and the Maryland State Department of Health, from an order directing the issuance of a writ of mandamus, after a hearing by the Circuit Court for Worcester County, sitting without a jury, commanding appellants and the Worcester County Board of Health to approve two applications for water supply and sewage disposal system permits as submitted by Robert C. Walker, appellee.

The appellee is the owner of two parcels of land located on Assateague Island. Situated between the Atlantic Ocean on the east and Chincoteague and Sinepuxent Bays on the west, Assateague Island is a barrier sand reef some twenty-three miles long in Maryland and extending nine miles into Virginia, varying in width from a quarter of a mile to approximately two miles, with land elevations from zero to twelve feet above sea level. Originally a part of a long peninsula extending southerly from the Maryland-Delaware line to Chincoteague, Virginia, on a part of which is now the resort town of Ocean City, Maryland, Assateague became an island when a major storm in 1933 cut an inlet through the peninsula just south of Ocean City. Its topography ranges from white sand beaches on the Atlantic shore to marshland on the west side. Some parts are covered with trees and grass while other areas, lower in elevation and known locally as "Foxhill Levels", are occasionally subjected to the wash of the tides. In general, the island is comparable topographically to the Ocean City area.

The portions of the island involved here lie near the middle of the Maryland area, several miles north of Foxhill Levels and several miles south of the Ocean City inlet, being a part of or contiguous to an area that has been subdivided in accordance with a recorded plat entitled "Ocean Beach, Inc., Maryland, Section A." This plat had been previously approved by the State Department of Health as complying with the rules and regulations promulgated under the authority of Code (1957), Article 43, section 396. The first of the subject parcels is a fifty acre tract on the west side of the island near Chincoteague Bay at a point where at one time construction was begun on a bridge from the island to the mainland; the other is a 200' x 200' parcel representing two adjacent lots in the platted

subdivision of Ocean Beach, Section A. For these two locations appellee designed sewage disposal systems which collected waste matter in 1000 gallon sedimentation tanks and discharged the liquid effluent therefrom into drain fields in the adjacent ground through a distribution box which regulates the flow to various sections of the drain field. The design of the systems was never questioned by the health authorities.

Walker submitted his designs and other relevant data to the office of the Deputy State Health Officer for Worcester County on May 27, 1963, on application forms supplied by the Health Department entitled "Application for Water Supply and Sewage Disposal System Permit." The application for the fifty acre tract described above was designated as permit No. 120-63; and the two lots were included in another application permit No. 121-63. These were received by Miss Alice Schoolfield, a sanitarian on the Department's staff for Worcester County, who in company with the appellee, proceeded to the sites to inspect the land and test the percolation qualities. At the first site, it being the fifty acre parcel on which Walker proposed to construct a hunting lodge, a test pit was dug in the sand and filled with water. The sanitarian timed the seepage or percolation of the water and recorded the result, 3 inches in 2 minutes, on application permit No. 120-63. They then proceeded to the site of the next parcel, the two contiguous 100' x 200' lots, where another test pit was dug. However, since there was no water available in the vicinity and since in her opinion the higher elevation and similar sandy soil justified it, Miss Schoolfield estimated the percolation time for the second parcel to be 1 inch in 1½ to 2 minutes, and entered this information on permit application No. 121-63. It is relevant to point out that the minimum percolation time required by the State Department of Health regulations is 1 inch in 5 minutes.

Application No. 120-63, which was submitted on the same day the percolation tests were conducted, was approved by Miss Schoolfield as an authorized agent and representative of Dr. Waesche, although appellee was not so informed. Application No. 121-63 was not actually received by Dr. Waesche's office until February 8, 1964, and in accordance with a directive in the form of a letter dated April 4, 1963, from Dr. Perry F.

Prather, Commissioner of Health, received by Dr. Waesche, was neither approved nor denied. However, both applications were sent to the Department's office in Baltimore as directed. When some time had passed without any word as to the disposition of his permit applications, appellee contacted Dr. Waesche only to be informed that the Department of Health had directed that all such applications for Assateague Island be forwarded to Baltimore for review. Then, when ten months had elapsed without any indication from the appellants as to the status of his permit applications, Walker on March 9, 1964, filed a petition for a writ of mandamus to require the appellants to either approve or disapprove the applications. Almost immediately, he received a letter from Dr. Waesche enclosing a copy of a letter to him from Dr. Prather dated March 26, 1964, in effect denying the permits for the stated reasons that "the soil and geographical conditions of these areas are such as to preclude a safe and proper operation of the desired installations." Upon receipt of this letter, appellee again petitioned for a writ of mandamus to review the actions of the appellants, alleging among other matters, that the denial of the permits was arbitrary and without justification.

At the hearing before Judge Prettyman, Walker testified that he was an architect, engineer and land surveyor registered in several states including Maryland. It was shown that he had been retained in the early 1950's by the promoters of the Ocean Beach project as their consulting engineer, had done all of the field surveying and engineering work necessary to the preparation of the recorded plats of the development, including the plat of Section A, and in connection therewith had determined elevations throughout the Maryland portion of the island with reference to the established United States Coast and Geodetic Survey benchmarks. He had also been retained as an engineer to supervise the construction of a private toll bridge from the island to the mainland. In the sanitation field, it was established that appellee had, subsequent to his formal education in that field, designed and supervised the construction of many installations of sewage disposal systems in Maryland and other states. More particularly, he testified that he had designed and installed systems both in the Ocean City area and on As-

sateague Island that had been approved by the health authorities. In his opinion, many of those systems had been on sites less favorable than these which are the subject of this litigation. After indicating that he was familiar with the sites in question, Walker was of the opinion that the requirements imposed by the regulations had been met and that from an engineering standpoint, there was no reason why the permits should have been denied.

Miss Schoolfield, a sanitarian with twenty years' experience in the Worcester County area, confirmed her percolation tests and stated without equivocation that in her opinion the soil at the two sites belonging to the appellee was suitable for subsurface drainage and that both of the submitted designs complied with the Department's regulations which she administers.

Dr. Waesche, who is charged with the responsibility of administering the regulations of the Department in Worcester County, testified that Miss Schoolfield's approval of permit application No. 120-63 was done with his knowledge and concurrence, and that application No. 121-63 also fully complied with the regulations, although he had not formally approved it because of the intervention of the Department officials in Baltimore. It was further developed that it was not the custom of the Department to require him to refer such application to it for review. The record indicates that this was the only time that such a request had been received. He also stated that until receipt of the letter from Dr. Prather directing all applications for Assateague to be sent to Baltimore, permits had been granted on the island for lots that were comparable to those owned by the appellee.

To answer the allegations of the appellee's petition for a writ of mandamus, the Department first called as a witness Dr. Prather. However, he stated that he was not familiar with either appellee's applications or the sites in question, had never been on or flown over Assateague Island, and in denying the permit applications he relied entirely upon the advice of his engineer, Robert Brown.

The record shows that Brown identified himself as the Chief, Bureau of Environmental Hygiene, Maryland State Department of Health, a post which he has held since 1951 and in

which he oversees, among other matters, the regulation of water sources and waste disposal systems. Although he stated he was familiar with Assateague, it developed that this familiarity grew out of two visits to the island. The first was early in 1959, a walking reconnaissance of the upper end of the island, several miles north of the Ocean Beach development. Later that same year he, in company with members of his staff, visited the Ocean Beach development. However, he admitted that he was not familiar with the specific sites here involved and had not knowingly visited them. Although the permit applications had been pending ten months, he had not requested anyone in his bureau to conduct an investigation or make tests of the soil or report concerning the geological conditions to be found at the sites.

At the conclusion of all of the evidence both sides moved for a directed verdict. After the testimony had been transcribed and filed there was a hearing on the motions which resulted in the court's overruling the appellants' motion, granting the appellee's motion, and the passage of an order for the issuance of the writ of mandamus, as prayed. On appeal the appellants present three questions: I. Was it prejudicial error for the lower court to refuse the testimony of the State's witness (Brown) as to the soil and geological conditions of the area in question; II. did the lower court err in the issuance of the writ of mandamus; and III. does the State Department of Health have the power to impose reasonable conditions governing individual water supply and sewage disposal systems?

## I

The question presented to the court below was whether the Department acted arbitrarily in disapproving appellee's applications for sewage disposal permits. The Department defended its action on the basis that the soil and geological conditions of Walker's locations rendered them unsuitable for subsurface discharge of waste effluent from septic tank systems. As the moving party, appellee sought to establish by his own expertise and that of the two Department employees, Dr. Waesche and Miss Schoolfield, that there was nothing about his sites that would, with the placement of sewage disposal systems thereon,

create a hazard to health. It was incumbent upon the Department to prove just the opposite. For this purpose, Brown was called by the Department as its principal witness. Objections made by the appellee were sustained with respect to his giving an expert opinion concerning the soil and geological conditions of the two locations precluding a safe and proper operation of the desired installations. Each question called for an opinion on his part and the lower court's refusal to permit him to express his opinion constitutes the Department's principal complaint here.

This case presents a basic question of evidence, i.e., upon what conditions and under what circumstances may a witness deemed to be an expert, express an opinion in the field of his expertise. This Court has dealt many times with expert and opinion testimony. An expert opinion derives its probative force from the facts on which it is predicated, and these must be legally sufficient to sustain the opinion of the expert. *Doyle v. Rody,* 180 Md. 471, 25 A. 2d 457. The premises of fact must disclose that the expert is sufficiently familiar with the subject matter under investigation to elevate his opinion above the realm of conjecture and speculation, for no matter how highly qualified the expert may be in his field, his opinion has no probative force unless a sufficient factual basis to support a rational conclusion is shown. *State, Use of Stickley v. Critzer,* 230 Md. 286, 186 A. 2d 586, and cases cited therein; *Hammaker v. Schleigh,* 157 Md. 652, 147 Atl. 790. The opinion of an expert, therefore, must be based on facts, proved or assumed, sufficient to form a basis for an opinion, and cannot be invoked to supply the substantial facts necessary to support such conclusion. The facts upon which an expert bases his opinion must permit reasonably accurate conclusions as distinguished from mere conjecture or guess. *Marshall v. Sellers,* 188 Md. 508, 53 A. 2d 5.

Despite all of his education and sanitation experience, Brown was not sufficiently familiar with the whole of Assateague Island or the particular properties belonging to the appellee, to be able to express any honest and meaningful opinion as to the effect the soil and geological conditions there present would have upon the functioning of a sewage disposal system. The record indicates that he had made only two trips to Assateague and

that the first of these was to inspect an area at the northern end of the island, far removed from the locations involved here. On his second trip he inspected the Ocean Beach development, a section of which includes the parcels belonging to appellee. It is doubtful that he could, from a short trip over a large area, become sufficiently familiar with a terrain so varied as to be able to ascertain the soil and geological conditions of individual properties by reference to a subdivision plat. This is particularly so when one considers that his visit to the island was made five years prior to the trial, at a time when the issue here had yet to be raised. He testified that a multitude of factors were involved in determining geological conditions, such as availability of the area, soil percolation, extent of percolation area, elevation of disposal area above ground water, and elevation above sea level. Any real knowledge of most of these conditions could be acquired only after investigation and testing, something he did not do, or by reliable scientific data or publications upon the conditions of the locality. He admitted having no information regarding the elevations on the island although this was the principal reason given for rejecting application permit No. 120-63. Judge Prettyman rightfully found that Brown for a period of ten months had no statistical or factual data with regard to elevations or soil or geological conditions existing on the properties involved. He had before him no charts, maps or plats upon which were delineated elevations, soil conditions, or geological features. No proffer was made to show that he had other data or publications to supply this information.

Educational and field experience are important in determining whether a witness is an expert qualified to pass judgment in a given case, but they alone are not sufficient to supply the basis upon which to rest an opinion. The opinion of an expert must be based on knowledge gained from observation or experience, standard books, maps of recognized authority, or any other reliable sources. *Casualty Ins. Co. v. Messenger,* 181 Md. 295, 29 A. 2d 653. Here, the trial court can not be said to have abused its discretion, for the judge was exceedingly careful to determine that neither Brown nor anyone in his Department other than Miss Schoolfield and Dr. Waesche, who reached

conclusions contrary to Brown, had made an investigation to determine the conditions prevailing on the island. With such a limited opportunity for personal observation and no reliable information available from other sources, it is manifest that any opinion on this subject expressed by Brown would have amounted to mere conjecture. Such opinions, even by experts, are not admissible.

## *II* and *III*

The Department contends that mandamus was not the proper route for judicial review. Its regulations pertaining to individual sewage disposal systems [1] provide in section 1.07 that if the approving authority—i.e., the deputy state health officer of the county in which a property is located, is satisfied with the design of a proposed system, he shall issue the permit. Section 1.08 states that if the approving authority is dissatisfied with the proposed design or the soil and geological conditions, he is to deny the permit. The regulations do not prescribe a procedure to be followed in the event an applicant feels aggrieved at the denial of his permit application so as to provide for or sanction reconsideration or review. Nor does Article 43 of the Code, under which authority these regulations were promulgated, provide for either administrative or judicial review of the decision of the approving authority. Furthermore, the Administrative Procedure Act, codified as Code (1957, 1964 Cum. Supp.), Article 41, Section 244 et seq. offers no relief to an unsuccessful applicant because the Department's regulations do not provide for the agency hearing that is a condition precedent to judicial review under the provisions of the Act. Here, no hearing was held to consider Walker's application.

In the past, this Court has held that judicial review could properly be sought by a petition for writ of mandamus where

---

1. Regulations Governing Individual Water Supply and Sewage Disposal Systems for Homes and Other Establishments in the Counties of Maryland Where Public Water Supply and Sewerage Systems Are Not Available. Adopted by the Maryland State Department of Health pursuant to authority conferred upon the State Board of Health and Mental Hygiene by Code (1957), Art. 43, § 2, effective November 16, 1953; amended April 18, 1957, and further amended October 15, 1957.

there was no statutory provision for hearing or review and where public officials were alleged to have abused the discretionary powers reposed in them. *Heaps v. Cobb,* 185 Md. 372, 45 A. 2d 73; *Hecht v. Crook,* 184 Md. 271, 40 A. 2d 673. While as a general rule mandamus is not proper to review non-ministerial acts of public officials or agencies, this Court has recognized that such will lie to remedy arbitrary abuses of discretion. *Walter v. Montgomery County,* 180 Md. 498, 25 A. 2d 682; Cohen, *Some Aspects of Maryland Administrative Law,* 24 Md. L. Rev. 1, 35-38 (1964). Appellee alleged in his petition that despite the fact that his sewage disposal systems complied in all respects with the applicable regulations, the Department refused without cause to approve his applications. The record before us discloses that the evidence presented in the lower court was ample to prove these allegations. Since the Department was unable to prove by legally admissible evidence that the systems did not meet the standards it imposed, its rejection of them must be either purely arbitrary or for reasons not related to its statutory function, and hence illegal. Decisions contrary to law or unsupported by substantial evidence are not within the exercise of sound administrative discretion, but are arbitrary and illegal acts. *Hammond v. Love,* 187 Md. 138, 49 A. 2d 75. Under these circumstances a petition for a writ of mandamus was the proper procedure for appellee to follow in seeking review of the Department's denial of his permit applications.

The Department asserts that it has the power to impose reasonable conditions governing individual water supply and sewage disposal systems. Little need be said concerning this proposition. In fact the appellee has never questioned the Department's power to adopt reasonable rules and regulations in accordance with its statutory authority. Cf. *Board of Health v. Crew,* 212 Md. 229, 129 A. 2d 115. However, the Department is bound by its own regulations, just as are applicants for permits, and can not in approving or disapproving applications presented to it, depart from those regulations and make *ad hoc* decisions.

In *Givner v. Commissioner of Health,* 207 Md. 184, 192, 113 A. 2d 899, our predecessors noted there was "abundant testi-

mony" to support the regulatory action of the commissioner and "no testimony to the contrary." The present case presents abundant testimony in support of the appellee and no substantial testimony to the contrary supporting denial of the permit applications, so that we are confronted with a situation representing *Givner* in reverse. We hold that the trial court was correct in ordering the issuance of the writ of mandamus.

> *Order affirmed. Appellants to pay the costs.*

OPPENHEIMER, J., filed the following dissenting opinion, in which HORNEY and SYBERT, JJ., concurred.

It is important that an individual shall have the right of judicial review when public officials are charged with having abused their discretionary power, even if the statutes give no such right. It is equally important that the state officials have full and fair opportunity, in the court proceedings, to explain their action. In this case, the State Department of Health, in my opinion, was improperly denied the right to show why it believed that the soil and geological conditions here involved precluded safe and proper operation of the desired installations. For this reason, I must dissent from the decision of the majority of my brethren.

The overall provision as to the soil and geological conditions is a part of the regulations governing private water supply and sewage disposal systems, duly promulgated by the Department under delegated legislative authority. The appellee was notified that because, in the judgment of the Department, this provision was operative, his applications were denied. There was substantial evidence before the lower court of the peculiar geological and soil features which Assateague Island presents. Dr. Prather, the State Commissioner of Health, referred to the effect of the ravages of storms on this long sandy barrier reef, whose highest elevation is 12 feet. Mr. Brown testified without objection that the Department was concerned because a number of installations had been built without properly issued permits from the local health department.

There was ample reason for Dr. Prather to ask the local au-

thorities to send all applications to the Department's central office for review. In *Board of Health v. Crew,* 212 Md. 229, 233, 129 A. 2d 115 (1957), we sustained an order for the abandonment of a well, issued by the Deputy State Health Officer for Harford County, after consultation with his superiors. Dr. Prather, while familiar with the island, is not an expert in the area. His Department feels its responsibility to reduce to a minimum the possibility of any health hazard developing. Mr. Brown, Chief of the Bureau of Environmental Hygiene, on whose advice Dr. Prather relied in recommending the denial of the appellee's applications, was not allowed by the court below to give the reasons for his opinion that the soil and geological conditions involved precluded a safe and proper operation of the desired installations.

Mr. Brown's educational qualifications and his experience in sanitation are conceded. He has a degree in chemical engineering from the University of South Carolina, and a Master of Public Health degree from Johns Hopkins University. He was on the staff of the St. Louis Health Division for seven years and with the South Carolina Board of Health for six. He has been Chief of the Bureau of Environmental Hygiene in the Maryland Department of Health since July, 1951. He has made two personal inspections of the island, with staff and local health authorities. One of these visits was an "end to end" inspection of an area known as the Ocean Beach Subdivision. Two of the three parcels of land here involved in the applications are contiguous lots located in Section A of this subdivision; the third parcel, to which the second application pertains, is a 50-acre tract located on the west side of the island, apparently not within the Ocean Beach Subdivision. On his "end to end" inspection, Mr. Brown looked "at the development which existed then on the various parts of the subdivision, and areas in which we had indication there might be applications referred in the future. We noted in particular the low levels of the island on which this construction existed, and in several areas which gave actual indication of tidal wash and where there was water standing at the present time." He testified he was familiar with the areas covered in both applications. He was not allowed to give the reasons for his opinion because he could not testify he had

stood on the properties specifically designated in the applications. This ruling of the lower court, in my opinion, was clearly erroneous, an abuse of its discretion, and highly prejudicial to the State.

In applying the general principles which govern the admissibility of expert testimony to the trial court's action in this case, in my opinion the majority has not taken into account the kind of testimony which Mr. Brown was prepared to offer. The question in this case is of a different kind than how an accident happened, [*State, Use of Stickley v. Critzer*, 230 Md. 286, 186 A. 2d 586 (1962)], or whether a building had been constructed in compliance with plans and specifications, [*Hammaker v. Schleigh*, 157 Md. 652, 147 Atl. 790 (1929)], or whether a non-expert can testify as to an individual's sanity, [*Doyle v. Rody*, 180 Md. 471, 25 A. 2d 457 (1942)]. It is true, as Judge Prescott said for the Court in *Stickley* (230 Md. at 290), that the opinion of even an extremely competent real estate appraiser as to the value of a certain tract of land would have little, if any, probative force if the expert had not seen the tract. The question here, however, is one of general sanitation, of soil and geological conditions on a low sandy wilderness, ravaged by wind and storm, and whether those conditions precluded the safe operation, from the point of view of the public health, of the sewage disposal system the appellee wished to install. Within this framework, the admissibility of the opinion of an admitted sanitation expert who had visited the surrounding area of the particular location did not depend on whether he had stood upon one precise spot in that location or another.

In another context, we set forth the considerations which, in my judgment, are applicable here, as follows:

> "A witness is qualified to testify as an expert when he exhibits such a degree of knowledge as to make it appear that his opinion is of some value, whether such knowledge has been gained from observation or experience, standard books, maps of recognized authority, or any other reliable sources. The knowledge of an expert in any science or art would be extremely limited if it extended no further than inferences from

happenings within his own experience." *Casualty Ins. Co. v. Messenger,* 181 Md. 295, 298-99, 29 A. 2d 653 (1943).

Several cases in other jurisdictions illustrate the application of this principle to analogous situations. Experts in veterinary medicine, connected with the Department of Agriculture, who made a specialty of investigating animal diseases, were held competent to speak of certain districts in Texas as being infected with a certain disease, though they may never have visited those districts in person. *Grayson v. Lynch,* 163 U. S. 468 (1896). The Supreme Court said:

> "In the nature of their business, in the correspondence of the department and in the investigation of such diseases, they would naturally become much better acquainted with the districts where such diseases originated or were prevalent, than if they had been merely local physicians and testified as to what came within their personal observation." 163 U. S. at 480-81.

The testimony of a properly qualified research geologist that chances for oil and gas in a 640-acre tract of land were not very good was held properly admissible, although the expert had only done geological work in the general area and examined the neighborhood of the tract involved. *Schooler v. State,* 175 S. W. 2d 664, 670-671 (Tex. Civ. App. 1943). See also Davis, *Administrative Law Treatise,* § 14.10 and Maguire and Hahesy, *Requisite Proof of Basis for Expert Opinion,* 5 Vand. L. Rev. 432 (1952).

Factors such as the length of time since Mr. Brown had examined the conditions on the island and the nature of his examination went to the weight of his testimony, not to its admissibility. For the court below to make these factors a bar to his giving his testimony was a prejudgment of evidence which the court had not heard.

The exclusion of the testimony was prejudicial from another point of view. The decision of the Department had been attacked as arbitrary. The court below recognized that Dr. Prather, the Commissioner, "must rely upon the advice of his advisers * * * [n]ow, he has testified that he has been advised

by members of his department, and that knowledge which has been imparted to him by those advisers, of course, he is entitled to rely upon and to act upon." It was essential for the Department to show what that advice was, and the reasons given for it, on the issue of whether or not the Department's action had been arbitrary. The testimony of Mr. Brown, who was the chief advisor of the Department in the matter, was admissible if only for this purpose. The evidence of Dr. Waesche and Miss Schoolfield went only to the specific tests called for by the regulations, not to the overall soil and geological conditions, as to which Mr. Brown had given his opinion to the head of the Department. It is a salutary rule of administrative law that a reviewing court, "in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *Securities Comm'n v. Chenery Corp.*, 332 U. S. 194, 196-197 (1947). See also Davis, *op. cit.* §16.12. Here, the testimony of Mr. Brown was highly relevant to show why the agency had acted as it did.

The State, as much as the individual, is entitled to a day in court. This, in the present case, by reason of the judge's ruling, it did not have. I would reverse the judgment and remand the case for a new trial.