**FREE STATE RECYCLING SYSTEMS CORP., Plaintiff,**

**v.**

**BOARD OF COUNTY COMMISSIONERS FOR FREDERICK COUNTY, MD., et al., Defendants.**

**No. MJG–92–1653.**

United States District Court, D. Maryland.

Sept. 14, 1994.

Ralph Gordon, Brenda D. Thew, Gordon & Simmons, Frederick, MD, for plaintiff.

Daniel Karp, Allen, Johnson, Alexander & Karp, Baltimore, MD, for defendants.

GARBIS, District Judge.

The third count of this case—in which Plaintiff seeks a declaratory judgment that Defendants' Solid Waste Amendment ("SWA") legislation was enacted in violation of Maryland and Frederick County law—was tried separately before the Court without a jury. Having heard the evidence, reviewed the exhibits, and considered the arguments of counsel made both orally and in memoranda, the Court issues this Memorandum of Decision as its findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52(a).

For reasons stated below, the Court concludes that the procedures employed in the enactment of the SWA fail to meet the requirements imposed by Maryland and Frederick County law. The hastily passed ordinance substantially bypassed vital steps in the legislative process. By disguising the focus of the ordinance until a point at which public comment would be meaningless, the Board of County Commissioners of Frederick County (the "Board") denied Free State Recycling Systems Corp. ("Free State") and others similarly situated their statutory right to participate in the process. As a consequence of that and other statutory violations addressed in the decision that follows, the SWA enacted on November 19, 1991, must be declared invalid.

## I. *STATUTORY BACKGROUND*

### A. *Maryland Law*

In Maryland, local legislative bodies are given broad discretion as to the manner in which they may enact zoning ordinances. A county council is limited only by the statutory requirement that they provide notice and a public forum to interested parties before so doing. Under Section 4.04 of the Zoning and Planning Article of the Maryland Code, regulations "may not become effective until 10 days after at least 1 public hearing in relation thereto, at which parties in interest and citizens shall have an opportunity to be heard." Md.Code Ann. art. 66B, § 4.04(a) (1988).

The related notice provision, requiring the disclosure of both technical information about the hearing and substantive information about the proposed zoning legislation, reads as follows:

> Notice of the time and place of the public hearing, together with a summary of the proposed regulation, restriction, or boundary, shall be published in at least 1 newspaper of general circulation in the jurisdiction once each week for 2 successive weeks, with the first such publication of notice appearing at least 14 days prior to the hearing.

*Id.* § 4.04(b). Taken as a whole, Section 4.04 requires that counties provide interested parties with a meaningful opportunity to be heard before they enact or alter zoning laws.

**B. *Frederick County Law***

Frederick County has established step-by-step procedures for the proper consideration of zoning text amendments. The process is begun as follows:

> An application for text amendment may be made by any citizen, initiated by resolution of the board of county commissioners, by motion of the planning commission or by any other governmental agency of the county. An application for text amendment will set forth the new text and the existing text, if any, to be deleted.[1]

Frederick County, Md., Code § 1–19–68(a). Applications are to be submitted on standardized forms, filed in the office of the zoning administrator, and open to public inspection for at least sixty days before the first hearing at which they are addressed. *Id.* §§ 1–19–67, 1–19–68(a).

The proposed amendment is first considered by the Frederick County Planning Commission (the "Planning Commission"), whose authority and actions are governed by the next section of the code:

> (a) All proposed ... text amendments will be referred to the planning commission for an investigation and recommendation.
>
> (b) The planning commission shall hold a public hearing on the proposed text amendment in accordance with this chapter.
>
> . . . . . .
>
> (d) Within thirty-two (32) days after the last public hearing or meeting, the planning commission shall forward its recommendation to the board of county commissioners.

*Id.* § 1–19–69. In sum, the Planning Commission is entrusted with the tasks of conducting the substantive evaluation of such amendments and providing the Board with recommendations informed by its expertise in zoning matters.

Within thirty days of its receipt of the Planning Commission's recommendation, the Board "shall hold a public hearing on the amendment requested." *Id.* § 1–19–70(1)(a). Notice of that hearing must meet the standards established in Section 1–19–72, which are essentially identical to those of Section 4.04(b) quoted above. The Board's authority to act upon the application is limited as follows:

> The decision of the county commissioners approving, denying, or dismissing any application for a ... text amendment shall be rendered within sixty (60) days of the last public hearing, unless such time is extended by an official resolution adopted by the county commissioners.

*Id.* § 1–19–70(2)(b).

As an integrated process, Frederick County's zoning laws are designed to ensure expert evaluation of proposed amendments by the Planning Commission, full and fair notice and opportunities for comment by potentially affected parties, and informed and timely decision-making by the Board.

## II. *THE ENACTMENT OF THE SOLID WASTE TEXT AMENDMENT*

For almost five years, Free State has attempted to secure the County and State permits and approvals needed to operate a solid waste recycling center in Frederick County, Maryland. The Board, after an election

1. The definitions section explains that "[t]he words 'shall' and 'will' are always mandatory and not discretionary [and t]he word 'may' is permissive." Frederick County, Md., Code § 1–19–4(a)(3).

swept new members into office, vigorously opposed the project and tried to prevent Free State from securing permits from the Maryland Department of the Environment and the Maryland Department of Natural Resources. Free State responded by filing a lawsuit. To settle the suit, Free State and the Board entered into a Settlement Agreement in which the Board agreed to help Free State get the necessary State permits.[2]

Notwithstanding the Settlement Agreement, the Board used its control over zoning restrictions to sidetrack the Free State project. During the second half of 1991, the Board commenced procedures for amending Frederick County's zoning ordinance to address its concerns about the growing number of waste disposal facilities in the area. Among its other reasons for taking the steps, the Board sought through the amendment process to stop the Free State project.[3] However, regardless of the motives for the changes, the SWA was not properly enacted.

The parties disagree as to whether Free State's facility fell within the "Recycling Operations" designation of the existing ordinance. The Court finds that it did. Although "Recycling Operations" was not given a codified definition, the classification was defined in practice and Free State met that definition.[4] In documents dating back to 1989, the Planning Commission and the Board labeled Free State a "recycling center" and a "recycling acceptance and processing facility." At trial, Frederick County Zoning Administrator Michael Thompson testified that he considered Free State to be a recycling operation. And, before the SWA was enacted, Free State had sought and received the necessary site plan approval to engage in such an operation. In a November 5, 1990, memo to County Commissioner Wayne Keeler regarding Free State, Frederick County Planning Director Jim Shaw wrote, "I would point out that our zoning/site plan approval was for a *recycling operation.*"

On August 8, 1991, the Board passed a resolution that directed "the [planning] staff to prepare proposals for zoning text amendments to provide better control over the approval and location of selected solid waste facilities." These "preliminary proposals" were to be sent "back to [the Board] by the first week of September for further direction and then [the Board would] start with scheduling." While several generalized concerns were mentioned in the resolution, no specifics were addressed and no text to be added or deleted was proposed. The Board filed no application form.

On September 26, 1991, the Planning Commission advertised a public hearing on the zoning text amendment, which was to be held on Wednesday, October 10, 1991.[5] The notice named a number of sections of the Frederick County Code to be amended by adding definitions, specifying districts in which certain types of facilities may be located, and establishing standards for floating zone uses and special exception uses. No suggestion was made that any existing permitted use would be deleted. No suggestion was made

2. In exchange for Free State's release of all claims against the Board, the Board agreed to

> provide a letter which MDE will accept as adequate grounds to issue a permit to Free State with respect to COMAR § 26.04.07.23G(1) and [Md.Code Ann., Envir.] § 9–210(a) [and, i]n the event that the Solid Waste Plan is amended substantially as currently proposed, and MDE requires or requests further information under the referenced statute and regulation, the Board will provide a letter that MDE will accept as adequate grounds to issue a permit to Free State with respect to those sections....

(Settlement Agreement, dated July 8, 1991, ¶ 4.)

3. At the Board hearing, a variety of comments by certain county commissioners made it clear that one of the underlying purposes of the amendment was to target Free State.

4. Under the definitions section of the county code, all terms not defined therein were to "have the meaning inferred from their context in [the Zoning Ordinance] or their ordinarily accepted definitions, as defined in *Webster's New Collegiate Dictionary* 1974 Edition." Frederick County, Md., Code § 1–19–4(a)(13).

5. The meeting was in fact held on *Thursday,* October 10, 1991. The Planning Commission never published a correction to the erroneous day and there was some evidence presented that turnout at the hearing was sparse. The Court finds this mistake to be, however, minor in comparison to the other oversights in this case and is not relying upon it.

that any changes aside from those listed in the advertisement were being considered.

The first complete draft of the SWA ("Draft 1") was available for public inspection the following day, only fourteen days before the Planning Commission's hearing. Dated September 27, 1991, Draft 1 lists the staff as the "applicant" for the amendment and, in its substantive sections, continues the classification of "Recycling Operations" as a permitted use subject to site plan approval. The applicant planning staff filed no application form.

On Thursday, October 3, 1991, the planning staff presented a revised version of the SWA ("Draft 2") to the Planning Commission for its recommendation. In its analysis attached to Draft 2, the staff made no mention of its consideration of any deletions of any existing uses from the zoning ordinance. To the contrary, they highlighted the fact that the "Solid Waste Operations" use table "includes the uses previously in the Ordinance and adds numerous new solid waste operation uses." The staff recommended "approval of the text amendment as proposed," noting only that other amendments may become appropriate after the implementation of the pending SWA.

Draft 2—publicly available for, at most, seven days before the hearing at which it was addressed—retained the "Recycling Operations" classification but differed from Draft 1 in several notable ways. For example, Draft 2 doubled certain minimum size requirements (from five to ten acres), expanded floodplain restrictions, and altered the use table to require solid waste floating zone approval (instead of the more simple site plan approval) [6] for facilities in the "General Industrial" district falling under the "Material Recovery Facilities—Separated Recyclables" classification. The cumulative effect of the changes in Draft 2 was that it became much more difficult for a wide variety of facilities to get zoning approval. Because "Recycling Operations" remained in the use table, however, these changes did not impact upon Free State.

On Thursday, October 10, 1991, the Planning Commission held a public hearing on the SWA—specifically, Draft 2—at which few general substantive comments were made and none were offered with regard to the "Recycling Operations" classification. A commission member moved "to recommend approval in accordance with the staff recommendation" and the Planning Commission voted six-to-zero in favor of so doing. Thus, the Planning Commission recommended "approval of [Draft 2] as proposed"—that is, without modification—to the Board. At that point, no one was authorized by the Planning Commission to amend the SWA in any way.

On November 2 and 9, 1991, the Board advertised a public hearing on the zoning text amendment, which was to be held on Tuesday, November 19, 1991. Again, although the notice listed sections to be added or supplemented, no suggestion was made in the notice that any existing permitted use would be deleted or significantly altered. Nothing in the advertisement suggested that any changes other than those listed therein were to be addressed.

Moreover, the advertisement stated that copies of the proposed amendment were available in the planning office and that the Planning Commission had voted for the approval of "this text amendment." From the times of publication until Monday, November 15, 1991,[7] only one day before the hearing, any interested party seeking to review "this text amendment" would have been given Draft 2, the only version available at the planning office. Consequently, a reasonably diligent party involved in recycling operations would have had no notice at that point

6. To be approved as a "solid waste floating zone," a site must, *inter alia,* be at least ten acres, have 150-foot setbacks, pass an environmental impact study, and have no portion located on a designated floodplain. *See* Frederick County, Md., Code § 1-19-325(E). To gain "special exception" approval, a site must, *inter alia,* be at least ten acres and have 150-foot setbacks. *Id.* § 1-19-404. In contrast, a simple "site plan approval" designation only requires compliance with general health and safety standards. *Id.* §§ 1-19-411 to -413.

7. The proposed text that was actually voted upon by the Board was only available after the close of business on Friday, November 15, 1991, and was thus available to the public on the following Monday.

that the SWA would affect its interests; to the contrary, that party would have taken reassurance of the very opposite.

Sometime shortly before Friday, November 15, 1991, for reasons that have not been explained, a new draft of the SWA ("Draft 3") was prepared for the Board to review. Without planning staff evaluation or Planning Commission review, and at the direction of neither body, county officials undertook to make expansive changes in the SWA. Draft 3 contains, among others, the following alterations:

> In the definitions section, the following new terms and definitions were added: Government Rubble Landfill, Government Solid Waste Transfer Station, Incinerator, Other Solid Waste Facilities, Resource Recovery Facility—Separated Recyclables, Resource Recovery Facility—Non-Separated Materials, and Sludge Amended Yard Waste.
>
> In the use table section, a "Government Rubble Landfill" classification was added in its entirety, *"Recycling Operations" was deleted in its entirety,* and the permission standard for "Sludge Pit" was changed from site plan approval to the more stringent special exception with site plan approval.
>
> In the section addressing solid waste floating zone designations, the previous requirement of an "environmental impact study" was changed to require a more onerous study "establishing that the proposed facility will cause no substantial adverse impacts on the environment."

The reason for the preparation of Draft 3 is not the only, or most significant, mystery about the document. What is even more important, and even less explicable, is the fact that Draft 3—although prepared in November—was dated as if it had been prepared on October 3, 1991 (the date displayed on Draft 2). Therefore, anyone seeking the "October 3, 1991" draft could (and it seems would) be given Draft 2, despite the existence of a revised draft bearing the same date. Moreover, any review of the documentation would lead one to the false conclusion that Draft 3 had been the subject of the October 10, 1991, public hearing. The Court can only conclude that someone, for some reason, falsely backdated Draft 3 to deceive persons who would rely upon the document's date as assurance of when it was created and the nature of its contents.

Neither the Board, the Planning Commission, nor any of their members made any effort to alert interested parties that a new draft was being prepared after the October 10 hearing.

The removal of "Recycling Operations" from the use table in the improperly backdated[8] Draft 3 was the key alteration with respect to Plaintiff's concerns. Such operations—under which Free State's facility fell—were recharacterized in Draft 3 as "Resource Recovery Facility—Non-Separated Materials," a use that required an application for, and the granting of, a solid waste floating zone designation. Free State's site cannot meet the additional requirements for such a designation.[9]

On Friday, November 15, 1991, but only after the close of business, Draft 3 became available to the public. This meant, essentially, that interested parties had one day to review this new draft before the public hearing held the following Tuesday. As a consequence, at least one interested organization other than Plaintiff—the Land Use Council of the Frederick County Builders Association—was prevented from meaningfully presenting its views to the Board. Although the Land Use Council submitted a detailed comments letter on November 14, 1991, and its representative testified before the Board at the hearing, neither effort was based upon a review of Draft 3. Despite attempts on Friday (when they were told of the draft too late

8. Backdating in the sense of having a document reflect a date earlier than its actual date of creation is not *per se* wrong. When a document is prepared to reflect the actual occurrence of a past event and there is no intent to deceive, use of the prior—but accurate—date can be proper. However, even in such cases, "as of" dating usually is preferable. Here, the backdating was simply false and misleading.

9. *See supra* note 6. The Free State site was approximately 2.8 acres in size and some portion was located on a floodplain.

to get to the planning office) and Monday (when they were told by the planning office that no copies were available), the Land Use Council was able to obtain a copy of Draft 3 only on the morning of Tuesday, November 19, 1991—the day of the hearing.

On November 19, 1991, the Board held a public hearing to consider the amendment to the zoning ordinance. After comments were taken and a brief protest was made by Free State, the Board voted to approve the amendment as the Solid Waste Amendment, Ordinance No. 91–32–032. The version of the SWA passed by the Board, written on or after November 19, 1991 ("Draft 4"), however, contained yet another set of changes from the previous drafts. Namely, Draft 4 eliminated the "Other Solid Waste Facilities" category altogether, limited the standards for government owned and operated facilities (previously covering towns and cities) to only Frederick County owned and operated facilities, changed the "Rubble Landfill" approval standard from special exception with site plan approval to solid waste floating zone, and prevented the previously permissible location of "County Government Solid Waste Transfer Stations" in "Highway Service" and "General Commercial" zoning districts while allowing them in previously off-limits "Village Center" districts.

The minutes to the Board meeting reflect the concerns of at least one commissioner that these changes "would be considered substantial changes as to what was advertised in the local newspaper." (*See* Board Minutes dated November 19, 1991, at 5, Pl.'s ex. 14.)[10] Despite the fact that the above-mentioned changes foreclosed previously possible zoning options and allowed facilities in new locations without the insight (pro or con) of public comment, the county declared that the changes were not substantial. Ignoring the extensive differences between the advertised Draft 2 and the adopted Draft 4, the Board included the following conclusory statement in the preamble to the enacted SWA:

> The Board of County Commissioners specifically finds that this adopted ordinance does not contain any substantial changes from the proposed text amendment reviewed by the Planning Commission and that every provision of this adopted ordinance was included in the summary of the proposed ordinance appearing in the newspaper notice so that nothing in this adopted ordinance is a substantial change from the newspaper notice.

(Zoning Text Amendment R–T–91–10, effective November 29, 1991, at 3, Pl.'s ex. 15.)

Merely reciting this, however, does not make it true. The Court finds as a matter of fact that it is not. Without repeating the litany of substantive changes between Draft 2 and Draft 3 and again between Draft 3 and Draft 4, the Court notes only that their breadth and depth belies any characterization of them as slight, insubstantial, or superficial. As one Maryland court recently stated, "Substantive violations of provisions that are at the heart of the amendatory process are not transmuted into 'mere technical violations' solely because [the legislative body] wishes it." *Blackwell v. City of Seat Pleasant,* 94 Md.App. 393, 617 A.2d 1110, 1115 (1993).

## III. *LEGAL STANDARD*

Two components of the legislative process must be evaluated to determine whether the Board's actions met the standards for the proper enactment of zoning laws in Maryland—substantive consistency and procedural accuracy. First, with regard to the substantive content of a proposed ordinance, the law of Maryland is as follows:

> [W]here there has been a substantial difference between the proposed zoning text amendment as advertised and as ultimately proposed to be passed by the local legislative body, that body must readvertise the new and substantially different proposed ordinance and have a hearing in regard to it.

*von Lusch v. Board of County Comm'rs,* 268 Md. 445, 302 A.2d 4, 8 (1973) ("*von Lusch I*"). *See also Rasnake v. Board of County*

10. The minutes do not reflect any consideration by the Board or the county attorney of whether the changes between Draft 2—the draft referenced by the advertisements as available for public review—and Draft 3 were substantial.

*Comm'rs,* 268 Md. 295, 300 A.2d 651, 653, 655 (1973); *Walker v. Board of County Comm'rs,* 208 Md. 72, 116 A.2d 393, 400, *cert. denied,* 350 U.S. 902, 76 S.Ct. 180, 100 L.Ed. 792 (1955); *von Lusch v. Board of County Comm'rs,* 24 Md.App. 383, 330 A.2d 738, 744 (1975) ("*von Lusch II*").

Second, with regard to the technical requirements of enacting a zoning ordinance, the Maryland Court of Appeals has explained that:

> The cases spell out the necessity of substantially complying with legislative procedural and substantive prerequisites as to notice and hearings if the action of zoning authorities is to be valid.

*Crozier v. County Comm'rs,* 202 Md. 501, 97 A.2d 296, 298 (1953). *See also Cassidy v. County Bd. of Appeals,* 218 Md. 418, 146 A.2d 896, 898 (1958) ("It has been stated so frequently and so generally that the failure of an administrative official or board to give the proper notice of a hearing, required by law, is fatal to the jurisdiction of the official or the board to conduct the hearing that it requires no citation of authority to support the proposition."); *Ajamian v. Montgomery County,* 99 Md.App. 665, 639 A.2d 157, 166, *cert. denied,* 334 Md. 631, 640 A.2d 1132 (1994); *Blackwell,* 617 A.2d at 1116.

In assessing whether the enactment of a zoning ordinance meets the requirements of the Frederick County Code, the Court must determine whether the Board substantially followed the procedures it itself established for such legislation. The Board is bound by its own regulations and must be held, at least, to the standards that they themselves have established. *See State Dep't of Health v. Walker,* 238 Md. 512, 209 A.2d 555, 561 (1965).

■ Thus, under Maryland and Frederick County law, when the board of county commissioners seeks to enact a zoning ordinance amendment free of flaws it must not substantially change the content of the advertised notice and must substantially comply with the established legislative procedures for passing such legislation. If substantial changes or procedural flaws occur during the legislative process, the county commissioners are obligated by law to readvertise the proposal and offer proper supplemental opportunities for interested parties to be heard.

## IV. *DISCUSSION*

■ The term "substantial," as it is applied in evaluating the differences between advertised and adopted text or the deviations from proper procedures in a given case, can only be defined in context. Something less than wholesale alteration or deviation, however, is meant. The Maryland courts have provided fitting guidance in their zoning case rulings.

Of notable similarity to the substantive changes that occurred in present case, the planning commission in the *von Lusch* case categorized airports in Queen Anne's County as a "non-conforming use" while the county commissioners adopted an ordinance that labeled them a "conditional use." The Maryland court found this difference to be substantial:

> This action of conferring a special exception status on the uses thereby making them a permitted conforming use not subject to phasing out or other restrictions applicable to the originally proposed non-conforming use status is a most substantial change in both theory and practical application of the provisions of that ordinance to those uses.

*von Lusch I,* 302 A.2d at 10.

In *Rasnake,* the commissioners changed the advertised draft of a Cecil County ordinance to add a new $500 bond requirement for landowners seeking to put live-in trailers on their property while building their house. The court concluded, "[W]e regard the amendment here as precisely the type of 'substantial difference between the ... amendment as enacted and the description thereof in the notice' which [a noted commentator] said would 'ordinarily invalidate the enactment.'" *Rasnake,* 300 A.2d at 655 (quoting McQuillin, *Municipal Corporations* § 25.249 (1965 ed., supp.1972)). And in *Town of New Market v. Milrey, Inc.–FDI Partnership,* 90 Md.App. 528, 602 A.2d 201 (1992), where the town tried to correct a resolution that contained an inaccurate property description without supplemental notice

or additional hearings, the Court of Special Appeals found the amendment invalid, concluding, "We cannot, by any stretch of the imagination, characterize the defect in the Annexation Resolution as 'inconsequential.' The description failed to close by 526 feet." *Id.* 602 A.2d at 209.

With respect to procedural inconsistencies, in the *Crozier* case, county commissioners were alleged to have held a new hearing on a previously denied rezoning application after the thirty-day period for such rehearings had expired, and thereafter changed the zoning map. Noting that "[t]he requirements of the ordinance are binding on the Commissioners sitting as a District Council and they may exercise their zoning powers only by following the procedure specified," the court found the plaintiffs to have alleged a variation from proper procedures substantial enough to proceed to trial. *Crozier,* 97 A.2d at 298. In *Ford v. Baltimore County,* 268 Md. 172, 300 A.2d 204 (1973), the hearing at which the proposed zoning ordinance was to be discussed was so disorderly and overcrowded that interested parties were given an opportunity to "testify" by filling out written comment sheets. Finding it uncontroverted that the comment sheets were never read by the county council and suggesting that the public hearing "was in reality no hearing at all but rather a rowdy and uncontrolled mob making any intelligent presentation or discussion of issues or giving of testimony practically impossible," the court ruled the resulting ordinance "void because of the failure to give the required hearing—a condition precedent to valid action by the County Council." *Id.* 300 A.2d at 214.

Following the examples provided by the Maryland courts, this Court adopts the following definitions: A textual change is substantial when it restricts the rights of a property owner to use his property in ways that previously were acceptable. A procedural variation is substantial when it undermines the rights of interested parties to a meaningful opportunity to be heard.

### A. *Substantial Changes from the Text as Advertised*

Section 4.04 of the Zoning and Planning Article of the Maryland Code requires zoning authorities to publish a summary of the proposed legislation, alerting interested parties to the provisions that are to be affected. Md.Code.Ann. art. 66B, § 4.04(b) (1988). In most, if not all, the cases brought to this Court's attention, the entire text of the proposed regulation was included in the advertised notice. *See von Lusch I,* 302 A.2d at 6 (noting that the commissioners published "the entire text of the amendments recommended by the Planning Commission"); *Rasnake,* 300 A.2d at 652 (finding that the published notice "set forth the proposed ordinance as amended verbatim"); *Walker,* 116 A.2d at 400 (finding that the full text of the proposed ordinance was published for two successive weeks).

In this case, the Board and the Planning Commission included only bare synopses of the areas of the ordinance to be addressed in their published notices. While that might have raised an issue with regard to the sufficiency of the summary provided, the Board also included in its advertisement the following:

> The Planning Commission voted to recommend APPROVAL of this text amendment. Copies of proposed amendment are available in the Planning Office.

Thus, a reasonable interested party would have before it—when evaluating the proposed legislation—both the published advertisement and a copy of the proposed amendment obtained from the planning office. *See Ottenheimer Publishers, Inc. v. Employment Sec. Admin.,* 275 Md. 514, 340 A.2d 701, 704 (1975) ("Where there is a statutory requirement of notice, the notice must contain such information and be presented in such a manner so as to 'enable a person of ordinary perception to understand the nature and purpose of the notice.'" (quoting *Bob Holding Corp. v. Normal Realty Corp.,* 223 Md. 260, 164 A.2d 457, 461 (1960)).

As was found above, the text available was Draft 2. In short, the notice available to interested parties was the advertisement and Draft 2 incorporated by reference therein.

The differences between Draft 2 and the adopted SWA (Draft 4) were substantial.

While this finding can be stated simply, there should be no misunderstanding that, assessing the alterations both individually and as a whole, pivotal and vast changes were made to the SWA after the proposed text was advertised. Property owners engaged in, or planning to engage in, a broad range of activities found themselves facing a multitude of additional zoning obstacles to their pursuit of those activities. Private owners of sludge pits, rubble landfills, and all peripheral facilities (that is, "other solid waste facilities"), as well as cities and towns engaged in solid waste operations, had more stringent zoning requirements attached to their operations. Again, no advance warning was given that these changes were even being considered.

Owners of recycling operations certainly were affected substantially. The category—kept in Draft 1, kept in Draft 2, approved by the Planning Commission, and provided to the public as part of the Board's advertised notice—suddenly disappeared just days before the Board's public hearing, in the falsely backdated Draft 3. Free State's designation, under which it had gained site plan approval and under which it had proceeded toward the completion of its facility, simply vanished. And along with it went Free State's ability to use its property for that previously acceptable purpose. Considering all the facts and circumstances of the present case, the Board's deletion of Recycling Operations from the use table was an even more substantial change than the alteration of the airport zoning standard found substantial by the *von Lusch* court, which in turn considered that "departure from the provisions of the originally proposed and advertised amendment [to be] more striking and different than was the substantial departure [*i.e.*, the new bond requirement] in *Rasnake.*" *von Lusch I,* 302 A.2d at 9. And this deletion, it must be remembered, was only one of the changes made between Draft 2 and the adopted ordinance.

■ The relevant case law does state that substantial changes may be permissible when such changes were indicated as possible in the original notice. *See Rasnake,* 300 A.2d at 653. The ruling by the *Ajamian* court provides a pointed example of this exception. In that case, the court found extensive notice containing the necessary warnings:

> It is equally undisputed, however, that: (1) several notices of public hearing on the redistricting plan were published in a local newspaper of general circulation; (2) these notices clearly stated not only that the Council would conduct a hearing on the Commission's redistricting plan but also that *the Council "by legislation may adopt boundaries different from those recommended* by the Commission," that "[p]ersons who wish to suggest modifications to the boundaries ... should do so at this hearing" that "Bills 56–91 and 57–91 ... proposed new boundaries for the five councilmanic districts," which "are alternatives to the" Commission Plan, and that *the Council "may consider other boundaries than those proposed* in bills 56–91 and 57–91"; (3) both the Leggett and Hanna proposals were discussed at public council meetings prior to the December 10 vote; and (4) the information packets available to the public prior to those meetings state that these proposals were under consideration.

*Ajamian,* 639 A.2d at 165 (emphasis added).[11]

■ The notices issued by the Planning Commission and the Board gave no such warnings. Nothing was included in the advertisement to suggest that the Board would

11. The *Ajamian* court also noted that "[a]nother factor that has been examined 'in determining whether an amendment to a proposed ordinance is such as to require a new public hearing is whether a significant added burden has been placed on those challenging it.'" 639 A.2d at 167 (quoting *Liberati v. Bristol Bay Borough,* 584 P.2d 1115, 1119 n. 13 (Alaska 1978)). In that case, however, the court found that the amendments in dispute did not adversely affect the complaining parties.

The same cannot be said in the present case. The burden placed on Free State, much like that faced by the party challenging the ordinance in *Ford,* was virtually overwhelming. *See* 300 A.2d at 207–09. Free State faced last-minute changes to the SWA, a vocal opposition from community members at the hearing, and a Board seeking some way to escape from the much maligned Settlement Agreement. The Court finds that "a significant added burden" was, in fact, placed upon Free State.

consider or adopt measures not specifically referenced therein. To the contrary, the Board's notices offered interested parties an opportunity to review a single proposal that was to be considered by the Board, described by the advertisement as "this text amendment"—to wit, Draft 2. Especially with regard to Recycling Operations, which survived the "first cut" between Draft 1 and Draft 2, the notices and concurrent actions of the Frederick County authorities served to reassure Free State that the category would remain on the use table as a permitted use. Because of the total absence of any warning, the exception cannot be found applicable in this case.

### B. *Substantial Procedural Flaws*

#### 1. *Fairness of the Hearings*

During the course of the enactment of the SWA, significant changes were made that were neither investigated nor addressed by the Planning Commission nor disclosed for public study or comment before the hearings at which the drafts were discussed. Parties expecting to comment on one version arrived at hearings only to find another, different version on the table for discussion. This was particularly true with regard to the Board's hearing, where the deceptive practice was taken to an extreme. In any event, no accurate version of the amendment—that is, the version later discussed—was publicly available for a period longer than seven days prior to the hearing at which it was addressed.

Maryland law requires that interested parties be given a meaningful opportunity to offer informed comments at statutorily mandated public hearings. *See Ford,* 300 A.2d at 211 ("When a hearing is required, it must be a fair hearing in all respects and not a mere form."). As one court further noted in the zoning context, "Accurate information is critical in order for a citizen or other interested entity to exercise intelligently the rights of notice and participation provided by the statute." *Milrey, Inc.,* 602 A.2d at 208. In this case, neither a meaningful opportunity nor timely, accurate information was provided.

In essence, by continuously altering the proposed text and by waiting until the final moment (and beyond) to insert pivotal changes into the SWA, the Board constantly disguised the true nature of its actions from interested parties such as Free State, forced them to address an ever-moving target, and denied them even inquiry notice that they might be effected by the amendment. *See Rasnake,* 300 A.2d at 655. The chaos caused by the repeated amendments and the absence of any forewarning of such revisions prevented Free State from determining how, or even if, they should react to the proposal. Under the compelling facts of this case, the Court must conclude that the hearings that were held did not provide Free State and others similarly situated with a meaningful opportunity to be heard. Consequently, the ordinance derived from the flawed hearings must be deemed invalid.

#### 2. *Variations from the County Code*

Finally, the Court must determine whether the Board followed the procedures established by the Frederick County Code when it enacted the amendment at issue. Those procedures—summarized above, *see supra,* Part I.B.—establish a sequence of mandatory events ensuring that ordinances are enacted only after appropriate review and public comment. The Board is obligated to follow them. *See Crozier,* 97 A.2d at 297 ("The power of the County Commissioners ... to zone or rezone is one that they have only by statutory delegation and can be exercised only to the extent and in the manner the Legislature has said that it may be.").

At the outset, no application was filed for the SWA. The plain language of Section 1–19–68, however, states,

> *An application* for text amendment may be made by any citizen, initiated by resolution of the board of county commissioners,....

Frederick County, Md., Code § 1–19–68(a). To avoid the application requirement and the attendant burden placed on the applicant, the Board would have this Court rewrite that provision to read:

> A request for an amendment may be made by application by any citizen *or* it may be initiated by resolution of the Board....

Even if this would be a better or wiser rule, such *post hoc* revision clearly is beyond this Court's powers. Unless and until Section 1–19–68 is properly amended to relieve the Board of this obligation, the Board must conform its conduct to its own standards. *See Walker,* 209 A.2d at 561.

The Board argues that it never before has been required to file an application and that, internally, this provision has been construed to allow the Board to seek zoning changes by resolution alone. That, however, is beside the point. First, simply because an application was never sought from the Board in the past (and it remains unclear whether similar instances occurred in the past), this Court is not free to ignore the unambiguous language of Section 1–19–68, which contains no exception to the application requirement for the Board.

Second, even if the provision were read to allow the Board to seek zoning amendments without filling out a standardized form, Section 1–19–68 cannot be construed to free the Board from making public the text to be added and deleted, as required of all applicants. *See* Frederick County, Md., Code § 1–19–68(a). By failing to submit an application form or any reasonable substitute therefor, the Board also failed to provide critical, timely, statutorily required notice of the changes it proposed to make. Having chosen the submission of application (and its inclusion in the planning office files) as the means by which the public may gain information about proposed alterations to the zoning laws, the Board cannot now be heard to exempt itself, *ad hoc,* from that requirement.

The Court's finding of violations of the application and notice provisions of Section 1–19–68(a) is not based merely upon the Board's technical failure to fill out the proper form. The violations were not merely technical and insubstantial, but served to avoid the significant notice requirement.

The Board argues that the sixty-day notice period before the first hearing on the proposed amendment, also found in Section 1–19–68(a), should not apply in situations where the text was not yet prepared at the time the amendment process was initiated. When the Board first resolved to study this zoning issue, it directed the planning staff to "bring preliminary proposals back to [it] by the first week of September for further direction and then start with scheduling." From that time until fourteen days before the Planning Commission hearing, no application was filed and, more importantly, no draft text was publicly available for review. Furthermore, the actual draft addressed by the Planning Commission was unavailable until a mere seven days before the hearing. In this case, it cannot be denied that the public was not provided with a sixty-day notice period.

The Court finds the Board's argument for unique treatment in this regard unpersuasive. The plain language of the ordinance provides for no such exception. Moreover, only the Board's unseemly haste prevented it from providing such a period after the initial study was concluded and a draft amendment came into existence. No reasonable impediments prevented the Board from starting the legislative "clock" on September 27, 1991, when a meaningful study period could have commenced.

Under the county ordinance, the Planning Commission is responsible for evaluating and holding public hearings on all zoning amendments and for deciding whether to recommend them to the Board. Frederick County, Md., Code § 1–19–69. This is not an optional assignment. The express language of the relevant section charges that "all" proposals "will" be investigated by the Planning Commission. *Id.* § 1–19–69(a). *See von Lusch I,* 302 A.2d at 10 (noting, in reference to a similar ordinance, that there is "sound reason" for requiring such input because "the County Commissioners should have the benefit of the expertise of the Planning Commission in the amendatory process").

In this case, vast and significant revisions to the SWA—changing its very nature—occurred after the Planning Commission's review and without its assessment of their impact on the overall zoning scheme. The Board's blanket assertion that the "adopted ordinance does not contain any substantial

changes from the proposed text amendment reviewed by the Planning Commission" is neither realistic nor truthful. If ever an altered zoning ordinance should have been sent back to the Planning Commission for reevaluation, this was the case.

Finally, Section 1–19–70(2)(b) of the Frederick County Code states, "The decision of the county commissioners *approving, denying, or dismissing* any application for a map or text amendment shall be rendered within sixty (60) days of the last public hearing...." Based on that provision, Free State alleges that the Board exceeded its limited statutory powers when it made additional changes to the SWA and that this constitutes a final failure to follow the proper procedures for enacting the desired legislation. The Court cannot read the above-quoted ordinance to hamstring entirely the Board. However, the Court also cannot ignore the direction of the Maryland Court of Appeals that the "powers granted to county commissioners should be strictly construed." *Walker,* 116 A.2d at 401. *See also Crozier,* 97 A.2d at 297. Moreover, the propriety of this particular limitation of the Board finds ample reinforcement in the substantial authority vested in the Planning Commission, as noted above. Viewed as a whole, Frederick County's statutory scheme does limit the Board's oversight in the zoning context.

In this case, it is clear that the Board did far more than approve, deny, or dismiss the text set before it at the November 19 hearing. It rewrote significant portions. This action was not only a usurpation of the statutory role of the Planning Commission, it was beyond the Board's own enumerated powers.

## V. *CONCLUSION*

The Court's decision was reached without consideration of the motives of the Frederick County Commissioners in enacting the Solid Waste Amendment. It may well be, as claimed by Free State, that the SWA was enacted in response to the political pressures generated by local citizens who were opposed to the facility, its location, and/or its ownership. This Court makes no determination in that regard. For, regardless of its motivation, the Board of County Commissioners manifestly failed to enact the SWA properly.

For the foregoing reasons, this Court holds that the Solid Waste Text Amendment, Ordinance No. 91–32–032, adopted November 19, 1991, was invalid.